278 N.J. Super. 481 (1994)
651 A.2d 507
CATERPILLAR FINANCIAL SERVICES CORPORATION, PLAINTIFF,
v.
SCOTT WELLS, JANET WELLS, RICHARD WELLS AND ROBERTA WELLS, DEFENDANTS.
Superior Court of New Jersey, Law Division Bergen County.
July 26, 1994.
*485 Michael Kahme, for plaintiff (Hill Wallack, attorneys).
Jared M. Lans, for defendants.
KOLE, J.A.D., Retired and Temporarily Assigned on Recall.
This is an action by Caterpillar Financial Services Corp. (CATF) for a deficiency against four guarantors of a lease of two pieces of heavy construction equipment in which CATF was the lessor and Wells Excavating, Inc. (the Wells Corporation) was the lessee. Given as collateral by the lessee under the lease was a third piece of heavy construction equipment owned by it that was subject to a security agreement assigned to CATF.
*486 The fact pattern in this case is somewhat unusual. Based on what I consider to be the credible evidence, I make the findings of fact and conclusions of law that follow.
The persons involved in the significant events include Richard Wells, Jr. He is not a guarantor and is thus not being sued for the deficiency. In or about August, 1988, he owned and operated Rigale Construction Co. (Rigale). He also was involved in the business of Wells Excavating, Inc. with his brother, Scott Wells. Scott and his wife, Janet, and Richard Wells, Sr. and his wife, Roberta, are the individual guarantors of the lease.
Caterpillar, Inc. (Caterpillar), the manufacturer of the Caterpillar heavy equipment involved herein, is the parent of CATF, its wholly owned subsidiary and financing entity. Caterpillar sells its equipment generally through a network of dealers, one of which is Foley Machinery (Foley), the selling dealer in the area covering New Jersey. It also has a dealer, Carter Machinery Co. (Carter), in which it has an ownership interest, the exact nature of which was not disclosed at trial by CATF. I find that it has a sufficiently substantial interest in Carter to justify a reasonable inference that a sale of equipment to Carter eventually benefits Caterpillar financially if Carter makes a profit thereon.
In 1988, Rigale purchased from Foley a 1987 excavator for $165,000. It entered into an installment sale and security agreement with Foley to finance the net amount of $136,430 (after deduction of various items, including a $92,000 trade-in). The total time balance was $160,812, to be paid in 36 monthly installments of $4,467, commencing February 10, 1988 and ending January 10, 1991. This installment sales contract and security agreement, with the underlying Rigale promissory note, were assigned by Foley, together with contracts and security agreements of other Foley customers, as a group, to CATF on August 3, 1988.
In October 1990, Rigale transferred its rights under the 1987 excavator contract to the Wells Corporation. At that time the *487 installments thereunder were almost paid in full, there being only three payments left, totalling $13,848.20, or approximately $14,000.
Some time prior to October 30, 1990, Foley, as lessor, entered into two equipment leases with the Wells Corporation, as lessee: (1) On March 29, 1990, for the wheel loader (valued at $90,000), at a rental of $4,875 per month, apparently on a month-to-month basis. (2) On December 13, 1989, for the 1989 excavator, (valued at $171,000), at a rental of $7,495 per month, apparently on a month-to-month basis. Neither lease provides for an option to buy by the lessee; but instead, requires that at the expiration of the lease term, the equipment must be returned to the lessor, Foley. The leases provide that at all times title to the equipment is in the lessor. The total monthly payments on both leases were thus $12,370. Foley filed UCC financing statements with respect to both pieces of leased equipment.
The Wells Corporation found these payments to be onerous. After discussing the matter with Foley's representative, the latter arranged for a conversion of the two leases into the present CATF lease, under which both pieces of equipment were leased from CATF at lower rental amounts by reason of a purchase option allowable to the lessee and a fixed term of 36 months. The conversion documents on Foley's invoices, dated October 31, 1990, show the following:

 Wheel loader
 Selling Price $ 90,000.00
 Rentals Paid 13,500.00
 ___________
 $ 76,500.00
 Sales Tax 5,355.00
 Interest 6,645.77
 ___________
 (apparently on past-due rents)
 Total: $ 88,500.77
 1989 Excavator
 Selling Price $171,000.00
 Rentals Paid 39,000.00
 ___________
 $132,000.00
 Sales Tax 9,240.00
*488 Interest 18,651.40
 ___________
 (apparently on past-due rents)
 Total: $159,891.40

The purchase option amounts at the end of the 36 months CATF lease term reduced the monthly rental payments on these two pieces of equipment. The reduced rentals resulted in a total saving to the Wells Corporation in excess of $6,500 per month. The option price at which the Wells Corporation could buy the wheel loader was $23,750; the option price for the 1989 excavator was $44,000. The options would have to be exercised not less than 60 days before the end of the lease term, but the price would be paid at the end of the term. The CATF lease, dated January 31, 1991 ("utilization date" in the lease), but executed on or about October 30, 1990, would terminate on January 31, 1994.
It should be noted that, although the Wells Corporation made only one rental payment under the lease with CATF, on November 29, 1990, covering each piece of equipment, in fact, there had been earlier rental payments thereon that were made to Foley under its leases.
The lease between CATF and the Wells Corporation required the latter to give additional collateral to CATF by way of granting CATF a "continuing security interest" in the 1987 excavator that Rigale had purchased from Foley and had transferred to the Wells Corporation; that equipment was subject to the security interest of Foley. In August 1988, as indicated, as part of a group of unrelated security agreements, Foley had already assigned its rights in the security agreement and the note it secured to CATF. The value of the 1987 excavator, when it was given as additional collateral to CATF, obviously was substantially more than approximately $14,000, the remaining balance under the installment sale and security agreement with Foley.
The CATF lease also required the guarantees of the Wells individuals and their wives, with the exception of Richard Jr. and his wife. Those guarantees, like the CATF lease itself, are in small and somewhat light type  all very difficult to read.
*489 There are various values, in the proofs, placed on the wheel loader and the 1989 excavator. On October 31, 1990, when converting to the CATF lease, Foley placed a value on the wheel loader of $88,500.77 and on the 1989 excavator of $159,891.40, or a total of $248,392.17. By use of amortization tables, CATF at trial placed the value as of August 7, 1991, when the equipment was sold by it to Carter, predicated on the principal balance remaining and past-due rent charges, with interest as follows:

 Wheel Loader  approximately $ 84,000.00
 1989 Excavator 150,849.00
 ___________
 Total: $234,849.00

According to defendant's expert, Alan Atkins (Atkins), as of January 11, 1991, a forced sale of the 1987 excavator would bring $75,000; of the 1989 excavator, $110,000, and of the wheel loader, $68,000  or a total forced sale value of $253,000 on all 3 pieces of equipment, and a total such value on the CATF leased equipment (the wheel loader and the 1989 excavator) of $178,000. With a 6% commission deducted for a forced sale involving an auction, the net values in January 1991 would be $103,400 for the 1989 excavator, $63,920 for the wheel loader, and $70,500 for the 1987 excavator.
The Wells Corporation executed UCC-1 Financing Statements in favor of CATF with respect to the wheel loader and the 1989 excavator, which were filed by CATF with the appropriate recording officers. The UCC-1 financing statements executed by the Wells Corporation in favor of Foley in connection with the Foley leases of the same equipment before the conversion to the CATF lease, and filed with the appropriate recording officers, were assigned by Foley to CATF. As indicated, the UCC-1 Financing Statements relating to the 1987 excavator, given as additional collateral under the CATF lease, had been assigned to CATF earlier, when the Foley note and security agreements were assigned to it.
The guarantees of the lease were signed by the four Wells family members who are parties to this deficiency action. Each of them unconditionally guaranteed payment to CATF of all rentals *490 under the lease, and, on demand, agreed to pay the amounts due and unpaid by the lessee, the Wells Corporation, including any costs, attorney's fees and expenses incurred by CATF by reason of the lessee's or guarantor's default. The guarantor waived "notice of any default by lessee, of any sale ... or disposition of the (leased) Equipment" or any fact materially increasing the guarantor's risk. There are further waiver provisions by the guarantor: The guarantor waived any right to require CATF (1) to proceed against the lessee; (2) to sell or otherwise dispose of the leased equipment; (3) to foreclose on or exhaust any security held from the lessee; or (4) to pursue any remedy to mitigate damages.
That the guarantees were given by reason of CATF's insistence that they be executed in order to enter into the lease with the Wells Corporation does not make them contracts of adhesion, entitling the guarantors to any special consideration on that score alone. The same may be said, for present purposes, as to the difficulty of reading (and thereby understanding) the fine light print in both the lease and the guarantees. These were contracts between business persons of bargaining positions that, although not equal, were not such that the lessee and guarantors can be said to be at such an economic or other disadvantage that, when the lease and guarantees were entered into, they were or could be imposed upon by CATF. No unconscionable conduct by CATF at that time has been shown. Indeed, it was the Wells Corporation, at its own request, that received needed rent payment relief as a result of the lease with CATF. Further, Richard Wells, Sr., at the time, was an experienced and substantial builder of home developments and apartment houses, who should have known, inquired and understood what he and his wife were signing. Robert Wells, to a lesser extent, had sufficient building and heavy equipment business experience similarly to protect himself and his wife. If necessary, the male guarantors, as businessmen, could have sought assistance in reading the significant language of the lease and the guarantees. Nevertheless, in *491 other circumstances, in the not-too-distant future, a court might well hold that the size and lightness of the type used in these documents by CATF so as to make them almost indecipherable should bar their enforcement on a presumed thesis of unconscionability. See, e.g., Milton Roberts, Annotation, Unconscionability, Under UCC Section 2-302 or Section 2-719(3), of Disclaimer of Warranties or Limitation or Exclusion of Damages in Contract Subject to UCC Article 2 (Sales), 38 A.L.R.4th 25, Section 26 (1985). I note that in order for the court to read them, an enlarged version had to be made.
The Wells Corporation, in early 1991, had difficulty in collecting money due it on a large project. It was thus compelled to file a Chapter 11 bankruptcy petition on February 7, 1991. On or about March 1, 1991, since the Wells Corporation had paid only one rental payment for each of the items of equipment under the lease, CATF sent a written demand to each of the guarantors seeking payment of $146,035.65, the amount due under the lease for the 1989 excavator, and of $71,951.88, the amount due under the lease for the wheel loader. The total amount due was thus $217,987.53. No payment was made.
Prior to the bankruptcy filing and prior to receipt of the March 1, 1991 demand letters by the guarantors, the Wells Corporation had defendants' expert, Atkins, appraise the three pieces of equipment. His forced sale value (without auctioneer commissions and related expenses), as of January 11, 1991, as already discussed, for all of the equipment was $253,000 and for the leased equipment alone, $178,000.
On March 22, 1991, the Wells Corporation filed a notice in the bankruptcy court proposing to abandon, among other items subject to lease or lien, the three pieces of equipment, claiming that it had no equity in them, and setting forth the amount of the liens: 1989 excavator (lien of $172,044); wheel loader (lien of $95,592); 1987 excavator (lien of $13,401). The property was stated to be of "inconsequential value" to the bankruptcy estate.
*492 Despite the abandonment of the equipment, they, together with other property to be abandoned, were scheduled to be publicly auctioned on May 1, 1991  apparently with the acquiescence of the bankruptcy court. The auctioneer was A.J. Wilner and Company; the auction was to take place in West Milford, New Jersey. It had been advertised in New Jersey.
On the morning of the auction, in a telephone conversation with Kristin Schulder of CATF, Scott Wells informed Ms. Schulder that the public sale was to be conducted that day by A.J. Wilner & Co. CATF objected to the sale of the three pieces of equipment, threatened suit if they were in the auction and demanded that Michael Sklar, of A.J. Wilner & Co., withdraw all of the equipment from the auction. Sklar, in response, advised CATF that any sale would be subject to its lien; that if it did not like the price received, it could withdraw the equipment; that he would not let anything go without CATF's approval, and that CATF would have ample time to determine whether to accept or reject any bids. CATF rejected Sklar's proposal and directed that the pieces be removed from the auction, just prior to its commencement. CATF did not endeavor to determine whether there actually was interest in the equipment at the auction, despite the fact that its attorney was informed that there were at least forty interested bidders, including exporters, present at the auction for all three pieces of equipment.
CATF caused the three pieces to be repossessed and delivered to Foley for an initial and a later more comprehensive inspection relating to the need, if any, for repairs, and for reports based on the inspection.
CATF's Ron Bell, who was in charge of sales of repossessed equipment, sent notices of the receipt of the equipment for resale to Caterpillar's network of dealers  92 in the United States and Canada  to see if they would be interested in buying any of the equipment and, if so, at what price.
Bell also prepared an analysis of what these pieces of equipment would bring at public auction. No decision was made by CATF at *493 that time whether to sell the equipment at public or private sale. The reason given by Bell was to allow CATF an opportunity to make a determination as to whether the best price for the equipment would be received by public or private sale. Bell's analysis revealed that CATF could expect to receive at a public auction net proceeds of $46,179.56 for the wheel loader, $45,360.48 for the 1987 excavator and $85,627.77 for the 1989 excavator. These net proceeds took into account the costs of the auctioneer, transportation costs and repairs to bring the equipment to auction ready status. Those dealers who expressed an initial interest in one or more pieces of equipment were then sent the comprehensive inspection reports. Those dealers also had the right to inspect the equipment.
CATF's practice is that if the dealers' offers are such that they did not minimize the company's loss or that of the person liable for a deficiency, at that point a public auction would be held.
Bids were subsequently received for the three pieces of equipment from about five dealers from mid-July through August 7, 1991 and the highest bid for each piece of equipment was made by Carter. Carter's bids were $45,500.00 for the 1987 excavator, $53,000.00 for the wheel loader and $72,500.00 for the 1989 excavator. According to Bell, after considering 1) the dealers' bids; 2) the net proceeds CATF could expect from a public auction; 3) the fact that the market for excavators and wheel loaders was poor at that time; 4) the recession in New Jersey, especially in the construction industry; and 5) the inherent risk in selling a piece of equipment at public auction, CATF accepted Carter's bids and sold the equipment at private sale to Carter on August 7, 1991 for a total of $171,000.00.
No decision by CATF was made as to whether to go to a public or private sale until it solicited and received offers from its dealers. The final decision to sell privately was made on the day of the sale to Carter, the highest bidder, on August 7, 1991.
No notice of the private sale or any details relating thereto was given to the Wells Corporation or the guarantors.
*494 It is clear from the proofs that CATF, under no circumstances, would have sold any of the equipment to Scott Wells, a guarantor, even if he requested such a purchase.
According to Ms. Schulder of CATF, soon after the auction date of May 1, 1991, Scott Wells called in order to pay the balance on the Rigale contract involving the 1987 excavator and have it released to him; but she informed him that the lien could not be thus released since the excavator was also additional collateral under the lease. She quoted him the balance due on all 3 pieces of equipment and did not offer any piece individually for sale to him. I find that her recollection is only partially correct and that Scott Wells actually inquired about buying all of the equipment, with the thought that he could arrange financing of a reasonable purchase price therefor worked out with CATF, either through his father, Richard, Sr., or others he knew. He needed the equipment to fulfill contracts he had from which he believed he could make sufficient money at least to repay the contemplated financing, but his request was flatly rejected by Schulder. I find that request was made in good faith by Scott Wells for the purpose, among others, of eliminating any deficiency against the guarantors. He was particularly concerned, since the Atkins, January 1991 forced sale appraisals he had seen showed that the auction on May 1, 1991, if permitted by CATF, would have produced sufficient funds so that no deficiency would result (The amount due on March 1, 1991, was almost $218,000; Atkins' values were $253,000).
Subsequent to the sales to Carter on August 7, 1991, the deficiency computed by CATF as of September 7, 1991, after allowance for the $17,339 it received for its claim in the Wells Corporation bankruptcy and the excess received over the debt due on the 1987 excavator given as collateral, and after the computation of the principal balance due, rent due, late charges and inspection and other fees (including legal fees), was $81,575.55. The payment of this amount was demanded in writing of each guarantor. As of May 25, 1994, with further items added, such as additional legal fees, costs and interest, $115,937.66 was claimed to *495 be due from the defendants-guarantors. This amount  $115,937.66  is the deficiency sought against them in this action.
In computing the principal balance due under the lease for the two leased pieces of equipment, amortization tables were used by CATF to determine the present value of future rental payments under the lease. An interest or discount rate of 11.4% was used.
Some comment is warranted on the analysis by Bell (of CATF) of the public auction values that made him decide that a private sale would bring a better price. It is of interest that about 75% of CATF's repossessed resales are private and only 25% are public. The private resales are to dealers only  on a wholesale price basis. As indicated, Bell's job is to minimize losses to CATF and to persons liable for a possible deficiency by getting the best available price. He uses an electronic system that gives public auction information reflecting average auction prices of the equipment involved for the prior year. Only gross prices are given; auction expenses are not taken into account. This analysis resulted in a gross price of $57,561 for the wheel loader; $98,272 for the 1989 excavator and $68,694 for the 1987 excavator. The net amount he computed  after repairs, commissions, freight charges and the like  was $46,179 for the wheel loader; $85,627 for the 1989 excavator and $45,360 for the 1987 excavator. Each piece of equipment was bid on as a separate item by the three to five dealers who actually bid.
Giving full credence to Bell's net auction price computations (including what appear to be some inflated proposed repair expenses), a comparison of those prices with those paid by Carter in a private sale is as follows:

 Net Auction Price Carter Price
 Wheel loader $46,179 $53,000
 1989 excavator 85,627 72,500
 1987 excavator 45,360 45,500

Bell accepted the $13,127 difference in favor of Carter on the 1989 excavator, he stated, since the excavator market was doing poorly at the time and he was concerned that the $85,000 price would not hold at an auction. He did not want to take the risk.
*496 Carter paid CATF a total of $171,000 for the three pieces of equipment. Although the actual prices paid by it, according to its records, are different from those given by CATF, after reselling the equipment, it received $220,000. However, with freight costs, and with repair costs only on the 1989 excavator, the $171,000 price paid by it was increased to $184,908, leaving a net profit to Carter of $35,092 from its resales. As indicated, that profit in some fashion must have benefitted Caterpillar, which had an ownership interest in Carter.
CATF objected at trial to the use of Carter's statement with respect to its resales. But it did not offer contrary evidence, even though it has a relationship with Carter.
Bell of CATF used no formal or outside appraisal of the value of any of the equipment. There was no use of any of the usual catalogues showing values to establish a value for appraisal purposes. None of the equipment was offered for sale to the Wells guarantors. The entire process involved in obtaining the public auction information, inspection information, and soliciting and obtaining Caterpillar dealer private bids took about 2 1/2 months  from June to August 7, 1991.
If, as Bell stated, his job is to see that the loss to CATF and to the person liable for any deficiency is minimized, the refusal of CATF to entertain offers to purchase from guarantors or others liable for a potential deficiency essentially is contrary to that policy.
One of the potential bidders at the May 1, 1991 auction was Steven Taylor, a general contractor, who owns heavy equipment and buys and sells such items as a broker for profit occasionally. He found the three pieces of equipment to be in fairly good to good condition. He was prepared to offer at the auction the following maximum prices:

 Wheel loader $ 60,000
 1989 excavator 80,000
 1987 excavator 60,000
 ________
 Total: $200,000

*497 This amount is less than the $218,000 due as of March 1, 1991; but, even if reduced by $12,000 to $15,000 in auction expenses, it exceeds the $171,000 paid by Carter.
Defendant's expert, Atkins, an experienced appraiser of personalty, has been involved in appraising the fair market value of heavy construction equipment, including 25 to 30 pieces of Caterpillar equipment. He was an impressive expert witness in this area. I accept his opinion that the sales of Caterpillar items bring in the best prices. In such appraisals he uses comparable sales, as disclosed by various recognized publications covering such sales. Reference to such recognized publications, as "Last Bid" (a report of auctions), "Data Quest" and "Green Guide," give his values much more credibility than those produced by CATF, which used no such appraisal guides. As indicated, the Wells Corporation had retained him in late December 1990 or early January 1991 to make an appraisal of its assets, including the three pieces of equipment here in question.
He presented in his January 1991 report the forced sale values thereof as of January 11, 1991, apparently on the thesis that the Wells Corporation was contemplating such sales in view of its financial condition and an imminent bankruptcy. His forced value appraisals, and the prices at which the equipment was sold to Carter follow:

 Forced Sale
 Jan. 11, 1991 Sales Price to Carter
 Wheel loader $ 68,000 $ 53,000
 1989 excavator 110,000 72,500
 1987 excavator 75,000 45,500
 ________ ________
 $253,000 $171,000

The forced sale amounts would have to be reduced, at a minimum, by 6% commission payable at a public auction, making the total $237,820, as compared to Carter's $171,000 purchase price. If the appraised forced sale values as of August 7, 1991 (the date of the sale to Carter) were used, the total amounts would be less, since the market for sales would not be as good at that time of the year. The aggregate amount would then be about $230,000 gross, or $216,000 net.
*498 Atkins also testified as to the gross forced sale value of the two leased items of equipment in January, 1994, the specified end of term of the CATF lease. His January, 1994 forced sale values were:

 Wheel loader $ 55,000  $ 60,000
 1989 excavator 75,000
 ________
 $130,000

The January, 1994 fair market values (as opposed to forced sale value) he gave were:

 Wheel loader $ 67,000
 1989 excavator 105,000
 ________
 $172,000

The threshold question is whether the CATF lease is a "true lease" or a lease intended as security. N.J.S.A. 12A:1-201(37) provides limited statutory guidance in resolving this issue. The Uniform Commercial Code (the Code) states in part:
Unless a lease or consignment is intended as security, reservation of title thereunder is not a "security interest" ... Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security. [N.J.S.A. 12A:1-201(37).]
While there are no absolute standards to distinguish a true lease from a secured transaction, there are certain factors, set forth below, that indicate that a lease is intended to be a security agreement. See Citi-Lease Co. v. Entertainment Family Style, Inc., 825 F.2d 1497, 1499-1500 (11th Cir.1987); Leasing Service Corp. v. American Nat'l Bank & Trust Co., 19 U.C.C.Rep. 252, 260-61, 1976 WL 23674 (D.N.J. 1976); In re Wallace, 122 B.R. 222, 231 (Bkrtcy.D.N.J. 1990); In re Noack, 44 B.R. 172, 175 (Bkrtcy. E.D.Wis. 1984).
Many of the provisions of the CATF lease constitute indicia of a lease intended as security. Thus, this lease requires that the lessee insure the equipment against all risks for not less than the balance due; that the lessee do any further act reasonably requested *499 to "protect" lessor's "security interest" in the equipment and lessor's rights and benefits under "this lease"; that the lessee will pay all taxes generally assessed against the lessor relating to the equipment; that the lessee will defend, indemnify and hold lessor harmless from all claims of lessee and third parties and all costs involved therein relating to the operation, ownership or maintenance of the equipment during the lease term or attributable to any defect in such equipment arising from material used therein or from its design or manufacture; that the lessee bears the risk of any loss, damage or casualty occurrence to the equipment; and that if the damage is deemed by the lessor not to be irreparable, the lessee must repair it, but if it is deemed irreparable or is worn out, lost or stolen, the lessee must pay the balance due (consisting of the amounts then due under the lease, the present value of the entire unpaid rental balance under the lease and the present value of the lessee's option price), and upon such payment by the lessee, the lease term terminates and the lessee shall be entitled to the equipment. Further, the remedies section of the CATF lease provides for acceleration of rental payments and sale in a "commercially reasonable manner" in the event of default. See Citi-Lease Co., supra, 825 F.2d at 1499-1500; Leasing Service Corp., supra, 19 U.C.C.Rep. at 260-61, 1976 WL 23674; In re Wallace, supra, 122 B.R. at 231-32.
In addition to the foregoing, the terms of the CATF lease expressly provide for the creation of a continuing security interest respecting the leased equipment-the wheel loader and 1989 excavator. Thus, it provides that title to and ownership of the equipment remain in the lessor "as security for the obligations" of the lessee until the lessee has fulfilled all of its obligations under the lease. It further provides that the lessee "grants" to lessor a "continuing security interest" in the equipment ("including attachments, additions, and replacements)... to secure the payment of all sums due hereunder." The lease also creates a security interest in the 1987 excavator given as collateral. That collateral is itself subject to a non-lease security agreement assigned to CATF; and if enforced, would be subject to the provisions of the *500 Code. Additionally, as indicated, the security interest in the leased equipment was perfected by the filing of UCC-1 Financing Statements with the proper recording offices for the protection of CATF; and the filed UCC-1 Financing Statement as to the 1987 excavator was assigned to CATF. Where, as here, the very form of the transaction is indicative of a lease intended as security, all the details of the arrangement pointing toward that conclusion are of importance. See Citi-Lease Co., supra, 825 F.2d at 1499; Leasing Service Corp., supra, 19 U.C.C.Rep. at 261, 1976 WL 23674.
Various courts have held that the acquisition of equity in the leased property by the lessee and the payment of a nominal option price at the end of the lease term are significant factors in determining that a lease is a security agreement governed by the Code. See In re Wallace, supra, 122 B.R. at 227; BJL Leasing Corp. v. Whittington, Singer, Davis & Co., 204 N.J. Super. 314, 320, 498 A.2d 1262 (App.Div. 1985). Consequently, a consideration in distinguishing a lease intended as security from a true lease is whether the contract in question might ultimately result in the lessee's gaining ownership of the subject matter of the lease. In re Wallace, supra, 122 B.R. at 228.
Pursuant to the CATF lease, the Wells Corporation was entitled to exercise its options at the end of the lease term to gain ownership of the 1989 excavator for $44,000 and the wheel loader for $23,750. These option prices are substantially less than the value attributed to the leased equipment on either Foley's conversion documents in 1990 ($248,392.17), or the CATF purchase price stated in plaintiff's brief  $215,405.00, as well as the projected value of such equipment at the end of the lease term, using either Atkins' estimated fair market values for January 1994 ($172,000.00) or forced sale values for the same date ($130,000.00). These facts, and the facts that follow, support an intent to create equity in the lessee over the life of the CATF lease.
Even though at the time CATF executed the 1990 lease it had no such actual 1994 values, Atkins' estimated values for January *501 1994 are useful, despite having been made after the fact; for they, in effect, represent a reasonable estimate of 1994 values, based on CATF's 1990 purchase price, depreciated over the life of the lease. They also represent a reasonable estimate of the 1994 values that must have been placed on the equipment by CATF when the option prices are considered. It is reasonable to assume that CATF expected that the options would be exercised and these amounts would be paid by the lessee in January 1994. This follows from a comparison of CATF's 1990 purchase price with the total rentals due under the lease, exclusive of options. Since CATF paid a total of at least $215,405.00 (using plaintiff's figures) for the 1989 excavator and the wheel loader in October 1990, and since the total rentals under the lease are $211,644.00, it appears that CATF would have made little, if any, profit at all from the rentals. There would have been no incentive for CATF to enter into the 36 month equipment lease where the total rental approximately equaled the price that it had paid for the equipment, unless it contemplated that the options would be exercised. It should be noted that the lease itself considered the option prices as part of the balance payable by the lessee in certain events  e.g., there is irreparable damage to the equipment. In any such event, the then present value of the option price is to be used, in part, in determining the amount to be paid by the lessee to CATF; after such payment the lessee obtains title.
The fact that the option prices, in the context of affording reduced rental payments to the lessee, are analogous to balloon payments at the end of a financing note secured agreement transaction is not without significance in this respect; and this, notwithstanding that a balloon payment must be made by the debtor, whereas the option to purchase and pay for the equipment here was not required to be exercised by the lessee.
Furthermore, admittedly, the Wells Corporation had substantial equity in the 1987 excavator at the inception of the lease, which it gave as collateral thereunder.
*502 Thus, in October, 1990, when the lease was signed, there was a real possibility that the Wells Corporation might eventually gain full ownership of all three pieces of equipment.
CATF argues that since the option prices available to the Wells Corporation on the wheel loader and the 1989 excavator are not nominal, the CATF lease cannot be considered a security agreement governed by the Code. However, the mere fact that the option price available to the lessee is not nominal does not necessitate a finding that the lease in question is not a security agreement.
[S]ubsection 1-201(37) only addresses the situation in which the purchase option may be exercised for little or no consideration; in that case, a security interest is intended as a matter of law. In all other cases, the determination of whether a security interest is intended is a matter to be decided according to the facts surrounding the transaction. Thus, even when the transaction is not conclusively presumed to be a secured transaction (as when more than nominal consideration must be paid by lessee to acquire the collateral), other factors may be used to demonstrate that a security interest, rather than a lease was intended.
[Hawkland, Lord & Lewis, U.C.C.Series Section 9-102:04 (Art 9) (citations omitted).]
Clearly, the CATF lease is not a security interest as a matter of law, since the option price is not nominal. Nevertheless, the inquiry does not end there. All of the facts of the case must be considered in determining whether a security interest was intended, including not only the clear indicia of a security agreement that are in the CATF lease itself, but also the actions of the parties to the transaction. No factor standing alone is conclusive in this respect. Citi-Lease Co., supra, 825 F.2d at 1500, n. 6, citing, J. White & R. Summers, Uniform Commercial Code Section 22-3, 880-83 (2d ed. 1980); In re Noack, supra, 44 B.R. at 175. Each transaction must be viewed on its facts, bearing in mind the Code's abhorrence of secret liens. Id. Under New Jersey law, it is the form of the entire transaction that determines whether a contract is a true lease or, as here, a lease intended as security. See Citi-Lease Co., supra, 825 F.2d at 1499; Leasing Service Corp., supra, 19 U.C.C.Rep. at 261, 1976 WL 23674. The terms of the CATF agreement, and the circumstances surrounding *503 the execution of the lease, already discussed, such as the reason for its execution (to afford relief by permitting lower monthly payments), are significant facts warranting the conclusion that a security interest was created. Also significant are the actions of the parties to the lease, such as the filing of UCC-1 financing statements.
For the foregoing reasons I find that the lease here plainly was intended as security.
Since the CATF lease has been found to be a secured transaction, the disposition of the collateral is governed by Article 9 of the Code, N.J.S.A. 12A:9-101-12A:9-507. Consequently, CATF's conduct was required to conform to the dictates of section 9-504 of the Code governing a secured party's right to dispose of collateral following default. It provides in relevant part:
(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation ... (3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.
[N.J.S.A. 12A:9-504(1) & (3).]
Before a secured party may dispose of collateral, he must provide the debtor with adequate notice. Section 12A:9-504(3) also provides that: "[R]easonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made must be sent by the secured party to the debtor ..."
The majority of jurisdictions interpreting the aforementioned provision have held that "guarantors" and other obligors who owe a collateral duty to pay deficiencies are debtors within the meaning of Article 9 of the Code. See Wang v. Wang, 440 N.W.2d 740, 742 (S.D. 1989); Ford Motor Credit Co. v. Lototsky, 549 F. Supp. 996, 1002 (E.D.Pa. 1982); see also United States v. Willis, 593 F.2d 247, 255-56 (6th Cir.1979) (guarantors permitted to invoke defense of commercial reasonableness). "Consequently, *504 these parties [guarantors] deserve the same notice protection that the Code gives the debtor, at least where the secured party has knowledge of the non-owner debtor's potential liability if the primary debtor defaults." James J. White & Robert S. Summers, Uniform Commercial Code Section 27-12 (3rd ed. 1988) [hereinafter, White & Summers]. Thus, defendants, as guarantors, are "debtors" within the meaning of the Code.[1]
In this case, it is undisputed that the equipment was sold at private sale and that no written notice of the sale was given to the Wells Corporation or the guarantors. When no notice is given of a sale, the governing law in New Jersey is that set forth in Block v. Diana, 252 N.J. Super. 650, 657-58, 600 A.2d 520 (App.Div. 1992), certif. denied, 127 N.J. 564, 606 A.2d 375 (1992):
New Jersey ... follows the rule that failure to give notice of sale will not deprive a secured party of all rights to recovery of a deficiency judgment... Our rule in such cases is that there is a rebuttable presumption that the collateral was worth the amount of the debt, and that the creditor will have the burden of showing that a commercially reasonable sale of the collateral would have yielded less than the balance due.
[Block, supra, 252 N.J. Super. at 652-53, 600 A.2d 520 (citing, Security Sav. Bank v. Tranchitella, 249 N.J. Super. 234, 244, 592 A.2d 284 (App.Div. 1991); Conti Causeway Ford v. Jarossy, 114 N.J. Super. 382, 386, 276 A.2d 402 (Dist.Ct. 1971), affirmed o.b., 118 N.J. Super. 521, 288 A.2d 872 (App.Div. 1972); Midlantic Nat'l Bank v. Coyne, 222 N.J. Super. 649, 657, 537 A.2d 798 (Law.Div. 1987); Franklin State Bank v. Parker, 136 N.J. Super. 476, 481, 346 A.2d 632 (Dist.Ct. 1975); T & W Ice Cream, Inc. v. Carriage Barn, Inc., 107 N.J. Super. 328, 337, 258 A.2d 162 (Cty.Ct. 1969))].
If CATF were successful in overcoming the presumption by proving that it sold in a commercially reasonable manner and thus received a fair and reasonable price for the wheel loader, the 1989 excavator and the 1987 excavator, it would be entitled to its entire *505 deficiency claim to the extent proven. See, Emmons v. Burkett, 256 Ga. 855, 353 S.E.2d 908 (1987); White & Summers, supra, at Section 27-19.
Since Caterpillar did not provide written notice of the private sale to the guarantors as required by the Code, it was required to rebut the presumption that the value of the equipment equalled the debt at the time of sale. Tranchitella, supra, 249 N.J. Super. at 245, 592 A.2d 284. CATF sought to overcome the presumption by "[i]ntroducing independent proof of the fair and reasonable value of the collateral (plus or minus any payments or charges incurred in disposing of the collateral) and comparing it with the price achieved at the actual sale." Id. The guarantors were also entitled to, and did in fact, introduce proof as to the value of the equipment. Id.
The essential inquiry is thus whether plaintiff has proven, by a preponderance of the evidence, that the sale resulted in the fair and reasonable value being obtained for the collateral and being credited to the account of the guarantors. See Midlantic Nat'l Bank, supra, 222 N.J. Super. at 654, 537 A.2d 798; Franklin State Bank, supra, 136 N.J. Super. at 482, 346 A.2d 632. This may be accomplished by establishing that, other than the lack of notice, every aspect of the disposition of the collateral was carried out in a commercially reasonable manner.[2] While N.J.S.A. 12A:9-507(2) sets forth several examples of commercially reasonable conduct[3], the term "commercial reasonableness," is not expressly defined in any portion of the statute. See Tranchitella, supra, 249 N.J. Super. *506 at 239, 592 A.2d 284. In Tranchitella, the court held that in evaluating this issue:
Evidence as to every aspect of the disposition including but not limited to the specific nature of the collateral, depreciated value, special markets, the amount and type of advertising done, the length of time which elapsed between repossession and resale, necessity for appraisal, public versus private sale, notice, price and normal commercial practices employed by the trade are pertinent. Emphasis must be placed on the totality of circumstances....
[Id. at 239-40, 592 A.2d 284]
CATF's burden of proving that the collateral was disposed of in a commercially reasonable manner becomes more significant in light of its failure to provide the Wells Corporation or guarantors with notice. This is so since many of the hallmarks of a fair and reasonable disposition of repossessed security require the presence of the debtor or his agent to safeguard his right of redemption and reduce his potential liability. Id. at 240, 592 A.2d 284.
The Commentary to N.J.S.A. 12A:9-504(3) suggests that the primary purpose of notification is to allow the debtor sufficient time to take appropriate steps to protect his interests before the final disposition of the collateral and to prevent the sale thereof at less than its true value. See Tranchitella, supra, 249 N.J. Super. at 241, 592 A.2d 284; see also, N.J.S.A. 12A:9-504, Comment 5; Franklin State Bank, supra, 136 N.J. Super. at 482, 346 A.2d 632. The underlying goal of the section is to give all persons having an interest in the collateral, such as the guarantors, a fair opportunity to bid at the sale, Tranchitella, supra, 249 N.J. Super. at 240, 592 A.2d 284; Midlantic Nat'l Bank, supra, 222 N.J. Super. at 656-57, 537 A.2d 798; T & W Ice Cream, supra, 107 N.J. Super. at 337, 258 A.2d 162; Chase Manhattan Bank, N.A. v. Natarelli, 93 Misc.2d 78, 401 N.Y.S.2d 404, 412 (Sup.Ct. 1977), and to encourage others to bid. See White & Summers, supra, section 27-20. The guarantors in this case were deprived of this fundamental right to reduce their potential liability. The significance of this violation of debtor's rights is compounded by the fact that Scott Wells actually wished to purchase all three pieces of equipment but his overtures in this respect were summarily rejected by CATF.
*507 Of the four exceptions to the reasonable notification rule listed by the Code[4], only one might conceivably be implicated by the facts here. That exception, found at N.J.S.A. 12A:9-504(3), excuses the creditor from notifying the debtor of the sale or other disposition of collateral when the debtor modifies or renounces his rights as to notification. However, under Article 9, a "debtor" can only renounce, waive or modify his right to notice of sale of the collateral by doing so in writing, after default. N.J.S.A. 12A:9-504(3); Hawkland, Lord & Lewis, supra, at section 9-504:07. As discussed, a guarantor is also a "debtor" under Article 9, since he owes a collateral duty to pay deficiencies. Consequently, the defendants-guarantors of the CATF lease had the right to be supplied with notice of the sale in the absence of a signed statement of renunciation, modification or waiver following default. N.J.S.A. 12A:9-504(3).
The guarantees that the defendants were required to execute, which were nearly illegible by reason of the size and faintness of the type, contained a clause expressly waiving notice of any sale or disposition of the collateral. This waiver provision as to notice is clearly ineffective under the Code, since it was not signed, as required, after the default of the Wells Corporation.
The most unusual aspect here was CATF's withdrawal of the three pieces of equipment from the public auction scheduled, with the acquiescence of the bankruptcy court, for May 1, 1991. Normally, of course, it need not have consented to the auction, since it owned, or had a substantial lien on, the equipment and the lessee had defaulted. However, under the facts of this case, its conduct in this respect cannot be deemed commercially reasonable. CATF refused to permit the auction and repossessed the equipment, despite Sklar's assurance that any sale would be subject to its lien *508 and its right to withdraw the equipment. CATF did not even investigate whether it could be made whole by the auction, although its attorney was advised that there were a great many interested bidders, including exporters, available to bid on the equipment. For example, as indicated, Steven Taylor, a general contractor, was prepared to offer $200,000 for the three pieces of equipment. While Taylor's bid may not have eliminated the full deficiency at that point, it would have lessened it considerably. There may well have been other higher bids at the heavily attended auction. The decision to withdraw the equipment from the auction, under these circumstances, effectively foreclosed CATF's earliest realistic opportunity to dispose of the collateral in a manner consistent with the commercial reasonableness requirements of the Code and without risk.
Perhaps the most troubling part of CATF's decision in this respect is the implication it raises concerning its alleged motivation to protect the interests of the guarantors. An appropriate concern for the potential deficiency against them reasonably should have prompted an affirmative response by CATF. It had nothing to lose by leaving the equipment at auction, subject to its lien and right to negate the results of the auction. It had everything to gain in terms of the potential to be made whole, or, at a minimum, the acquisition of useful information as to the value of the collateral. Such information concerning the price the equipment would fetch when subject to competitive bidding might have saved CATF from its current task of establishing that it obtained a fair and reasonable price when it later sold to Carter. The analysis conducted by Ron Bell, ostensibly to ascertain what price the equipment might bring at public auction, is a wholly inadequate substitute for the real thing. It is difficult to credit CATF's assertion that it sought to minimize its loss and that of the guarantors by first repossessing the equipment and offering it to its dealers before resorting to a public auction, when it could have tested the risk of an auction without cost on May 1, 1991. In this fashion, it could have obviated the more than three month delay involved in the eventual sale of the equipment to Carter.
*509 By only offering the collateral to Caterpillar's own network of 92 dealers for resale, and ultimately selling it to one of them, a partially owned affiliate of Caterpillar, CATF deprived the guarantors, any non-Caterpillar network dealer, and other interested persons of an opportunity to reduce the debtors' potential liability through competitive bidding at either a public or private sale. There is indeed a striking disparity between the efficacy of a public auction, where forty interested potential bidders have an opportunity physically to inspect an item for sale, and the circuitous and time-consuming methodology employed by CATF's Bell. It should be noted, further, that Bell, without any truly reasonable justification, sold the 1989 excavator to Carter, Caterpillar's affiliate, even though his own net public auction figure was some $13,000 higher for that equipment. In any event, some undeniable benefit would have accrued to CATF, and hence the guarantors, through utilization of the risk-free May 1991 auction approach.
Although CATF had financed the equipment to the debtors at retail, upon repossession, it disposed of the collateral via a limited wholesale market, its own retail dealer network. While in some situations a wholesale disposition may be commercially reasonable, depending on the available markets, Spillers v. First Nat'l Bank of Arenzville, 109 Ill. App.3d 1100, 65 Ill.Dec. 557, 561, 441 N.E.2d 872, 876 (1982), where collateral is financed at the retail level, a resale at retail may be a prerequisite to a finding of a fair and reasonable disposition. See California Airmotive Corp. v. Jones, 415 F.2d 554 (6th Cir.1969); Ford Motor Credit Co. v. Jackson, 126 Ill. App.3d 124, 81 Ill.Dec. 528, 529-30, 466 N.E.2d 1330, 1331-32 (1984). The limited wholesale market used by CATF, under the unusual circumstances of this case, was not commercially reasonable.
CATF received $171,000 for the collateral from Carter, its affiliated company. Carter later sold the equipment for $220,000, at a net profit to it of $35,092. With the backdrop of CATF's unexplored avenues for larger returns, already discussed, this disparity in price is so excessive as to undermine CATF's arguments *510 concerning the commercial reasonableness of the sale. Although mere inadequacy of price is insufficient itself to establish that the sale is not commercially reasonable, Tranchitella, supra, 249 N.J. Super. at 243, 592 A.2d 284, evidence that the price received for the goods sold was substantially less than their value and substantially less than that which the purchaser had resold them indicates that they were not disposed of in a commercially reasonable manner. See Mercantile Financial Corp. v. Miller, 292 F. Supp. 797, 801 (E.D.Pa. 1968); Boender v. Chicago North Clubhouse Ass'n, 240 Ill. App.3d 622, 181 Ill.Dec. 134, 141, 608 N.E.2d 207, 214 (1992) (price received at subsequent sale to third party is indicator of fair market value).
CATF's failure to obtain an independent appraisal of the equipment prior to sale provides further evidence that the disposition was not commercially reasonable. See U.S.A., Etc. v. Chatlin's Dept. Store, 506 F. Supp. 108, 112 (E.D.Pa. 1980), citing, California Airmotive Corp. v. Jones, 415 F.2d 554 (6th Cir.1969) (setting of evaluation figure without independent appraisal has been held to be sufficient to state claim of commercial unreasonableness); Tranchitella, supra, 249 N.J. Super. at 244, 592 A.2d 284; Spillers, supra, 65 Ill.Dec. at 563, 441 N.E.2d at 878; see also Weaver v. O'Meara Motor Co., 452 P.2d 87, 91-92 (n. 17) (Alaska 1969) (seller overcame presumption of commercial unreasonableness created by failure of notice by having independent appraisals, attempts to locate prospective purchasers in several states, and testimony that sale was to the highest offer available at time of sale).
The appraisal conducted by Atkins demonstrates that the value of the equipment greatly exceeded the amount that CATF received on its sale to Carter. Even CATF's expert analysis, prepared by Bell, revealed that the average gross auction prices in the preceding twelve months ($224,527) exceeded the price realized ($171,000) by approximately $53,000 (exclusive of repair, commissions, freight charges and the like). Admittedly, Bell's net auction prices were closer to the amount realized on CATF's sale *511 to Carter; however, these figures were calculated by deducting excessive amounts for repairs and other charges. The exaggeration of these charges is illustrated by the fact that Carter only repaired the 1989 excavator before reselling all three pieces of equipment for a substantial profit two weeks later.
Another indication of the commercially unreasonable character of CATF's sale is the value attributed to the equipment a mere nine months prior to the sale to Carter. CATF sold the equipment on August 7, 1991, for $171,000.00. The initial sales price to CATF or value for the wheeloader and 1989 excavator on October 1, 1990, the inception of the lease, according to Foley's conversion documents, was approximately $248,392 (or $215,405, the sales price used in plaintiff's brief). If the equity in the 1987 excavator is added, the value would be even higher. Manifestly, the initial sales price or value and the final selling price are so disparate as to show that a commercially reasonable disposition did not occur. "... [W]hen a creditor decides to liquidate the assets of the primary obligor, it must act as the obligor's fiduciary and make a sincere effort to obtain the full market value for the property." Chatlin's Department Store, supra, 506 F. Supp. at 111. CATF failed to credit defendants for the reasonable value of the equipment at issue.
CATF's sale to its sister company, Carter, also requires close scrutiny. CATF is a wholly owned subsidiary and financing arm of Caterpillar, and the equipment was sold privately after repossession, to Carter, another related corporation of Caterpillar, which resold the equipment at a substantial profit  some $35,000. As indicated, that profit must have benefitted Caterpillar in some tangible way. Cf. Warnock Automotive Group v. Dept. of Treasury, General Services Admin., Div. of Purchase & Property, 272 N.J. Super. 450, 640 A.2d 332 (App.Div. 1994).
Pursuant to the Code, CATF had the obligation to make a good faith effort to secure the highest net benefit for the debtor. See N.J.S.A. 12A:1-203; Tranchitella, supra, 249 N.J. Super. at 241-43 (n. 2), 592 A.2d 284. This duty to the debtor is *512 tempered by CATF's concerns respecting the uncertainty of disposing of the collateral in a potentially more lucrative market. Tranchitella, supra, 249 N.J. Super. at 241-42 (n. 2), 592 A.2d 284. However, under the facts here, these concerns by CATF unfortunately were adverse to the interests of the guarantors and seriously undercut its duty to secure for them the best net benefit. The Code's good faith requirement is but another illustration of our courts' traditional recognition that in every contract there exists an implied covenant of good faith and fair dealing. See Palisades Property, Inc. v. Brunetti, 44 N.J. 117, 130, 207 A.2d 522 (1965). CATF's self-serving efforts in respect to the disposal of the three items of collateral fail to establish that it truly sought to secure the highest possible price for the collateral.
For the foregoing reasons, I conclude that CATF has failed to establish that its disposition of the collateral was commercially reasonable and that it fulfilled its duty of good faith and fair dealing owed to the defendants-guarantors.
The sale of the three pieces of equipment was not accomplished in a commercially reasonable manner as required by N.J.S.A. 12A:9-504(3). CATF simply failed to rebut the presumption, arising by failure to give notice of the sale, that the collateral was worth the amount of the debt by proving, by a preponderance of the evidence, that a commercially reasonable sale would have yielded less than the amount of the debt. The value of the collateral, therefore, is presumed to be equal to the debt, resulting in the elimination of any claimed deficiency. See Midlantic Nat'l Bank, supra, 222 N.J. Super. at 656-57, 537 A.2d 798; T & W Ice Cream, Inc., supra, 107 N.J. Super. at 337, 258 A.2d 162.
A judgment of no cause of action in favor of defendants will be entered. No costs to any party.
NOTES
[1] See, N.J.S.A. 12A:9-105(1)(d) "Debtor means the person who owes payment or other performance of the obligation secured, whether or not he owns or has the rights in the collateral ... Where the debtor and the owner of the collateral are not the same person, the term debtor means the owner of the collateral in any provision of the Chapter dealing with the collateral, the obligor in any provision dealing with the obligation, and may include both where the context so requires."
[2] See Tranchitella, supra, 249 N.J. Super. at 239, 592 A.2d 284: "[C]ommercial reasonableness, should be viewed as a flexible concept, based upon a consideration of all relevant factors presented in each individual case."
[3] N.J.S.A. 12A:9-507(2): "... If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner."
[4] See, Hawkland, Lord & Lewis, U.C.C. Series Section 9-504:07 (Art 9) "... when the collateral is perishable, when the collateral threatens to decline speedily in value, when the collateral is of a type customarily sold on a recognized market, and when the debtor modifies or renounces his rights as to notification ..."; N.J.S.A. 12A:9-504(3).