## In re WILMINGTON HOSPITALITY LLC, Debtor.

### No. 01–19401DWS.

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 10, 2005.

Albert A. Ciardi, III, Janssen Keenan & Ciardi, P.C., Philadelphia, PA, for debtor.

Dave P. Adams, Frederic J. Baker, Office of the U.S. Trustee, Philadelphia, PA, for trustee.

### *OPINION*

DIANE WEISS SIGMUND, Chief Judge.

Before the Court is the Debtor's Motion to Expunge Claims of Great American Leasing Corporation (the "Motion"). For the reasons set forth below, the Motion will be Denied.

**BACKGROUND**

The facts governing this Motion are not in dispute. Simply stated, Debtor leased certain kitchen equipment (the "Equipment") from Marlin Leasing Corpo-

ration ("Marlin")/Great American Leasing Corporation ("GALC") to be used in the operation of a hotel being constructed in Wilmington, Delaware ("Hotel").[1] Equipment Lease Contract, Exhibit R–1 (the "Lease"). As Debtor made no payments under the Lease, GALC was granted relief from the automatic stay in connection with its lease claim in the amount of $295,000. For reasons that are not relevant to this contested matter and which have been outlined in other writings by this Court, the Hotel was transferred to Debtor's secured lender Republic Bank ("Bank") pursuant to a stipulated agreement to which GALC consented. Exhibit D–1. As pertinent to the matters at hand, the Stipulation provided that if the Bank records the Hotel Deed under the conditions of the Stipulation, it had two options with respect to the Equipment which remained in the Hotel.

It could purchase the Equipment by payment to GALC or request that GALC remove it from the Hotel within twenty days of written request to do so or it would be considered abandoned. *Id.* ¶ 8. On June 3, 2002 Bank gave notice to GALC to remove the Equipment by June 14, 2002 setting forth certain conditions of the "extension."[2] However when GALC attempted to do so, it was blocked by Bank for reasons that are alluded to but not dispositive of this Motion. Suffice it to say that GALC was unable to recover the Equipment.

While the timeline is unclear, Joseph Capano ("Capano"), Debtor's principal and a guarantor of the Lease, had put together a deal to minimize his exposure.[3] Seeking a buyer for the Equipment, he purportedly received an offer to purchase it from Hercules Country Club ("Hercules") for

1. The Equipment Lease Contract dated November 8, 1999 is between Marlin and Debtor for certain Singer Equipment. Marlin subsequently assigned its rights to GALC. Marlin also asserts a secured claim of $21,000 on its own behalf which Debtor's counsel stated did not arise from the same lease transaction. While the legal contention is the same with regard to the Marlin and GALC claims, there is no evidence about this separate Marlin transaction and thus I am unaware of the factual basis for expungement of this claim. Bankruptcy Rule of Procedure 3001(f) provides that a proof of claim executed and filed in accordance with the rules of procedure constitutes *prima facie* evidence of the validity and amount of the claim. *Amatex Corporation v. Aetna Casualty & Surety Co., et al.*, 107 B.R. 856, 870 (E.D.Pa.1989), *aff'd*, 908 F.2d 961 (3d Cir.1990); *In re Wall to Wall Sound & Video, Inc.*, 151 B.R. 700, 701 (Bankr. E.D.Pa.1993). The objecting party carries the burden of going forward with evidence in support of its objection which must be of probative force equal to that of the allegations of the creditor's proof of claim. *Id.* "The objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claims legal sufficiency." *In re Allegheny International, Inc.*, 954 F.2d 167, 173 (3d Cir.1992). In the ab-

sence of evidence, Debtor's Motion as to Marlin fails under applicable burdens of proof, and the separate Marlin claim is allowed.

2. This 10 day notice replete with requirements not mentioned in the Stipulation suggests there had been a prior written notice of removal conforming to the twenty day notice of the Stipulation. Notably on June 11, 2002 GALC filed a Motion to Modify the Stipulation to extend for sixty days (*i.e.*, until August 14, 2002) the time it would have to remove the Equipment. The dispute over Equipment removal was the subject of litigation between GALC and Bank in this and the district court concluding with my Memorandum Opinion and Order dated April 3, 2003, Doc. No. 285, as well as the Delaware state court. During that period and apparently at no time prior to the settlement that resulted in the payment of $125,000 to GALC from Bank was GALC able to retrieve the Equipment. Also notably during the litigation before me the Debtor took no position and disclaimed any interest in the outcome of the dispute.

3. While Debtor's attorney refers to the Debtor's exposure, it is clear from Capano's testimony that he views the Debtor and himself to be one and the same.

$225,000. The offer was not reduced to writing nor did Hercules view the Equipment. Most significantly, the offer was contingent on delivery of the Equipment to Hercules which refused to put up the purchase price or even a deposit in advance. With the potential sale in play and without advising GALC that a third party was purchasing the Equipment for $225,000, Capano's attorney negotiated a settlement of the GALC claim against the Debtor and Capano for $225,000 along with a release of the Equipment. While Hercules, the ultimate buyer, refused to put up any funds prior to delivery, the full purchase price was put into escrow with GALC's attorney by Capano's son at Capano's behest. Under these facts, Capano contends that the value of the Equipment should be fixed at $225,000 based on his securing a buyer ready, willing and able to perform with the purchase price in escrow.

When GALC was unable to recover the Equipment for delivery to Capano, the escrow was released. At an impasse, GALC negotiated a resolution with the Bank whereby it relinquished its right to the Equipment in consideration of the payment to it of $125,000. No notice of the disposition of the Equipment was provided to Debtor or Capano. GALC has applied that payment to reduce its claim against the Debtor's estate but Debtor objects to allowance of any claim, even as reduced.

Debtor makes the following argument in support of its Motion. Under the Plan, Debtor relinquished the Equipment to GALC in full satisfaction of the secured claim and any deficiency resulting from the liquidation of the Equipment was to be treated as an unsecured claim. However, GALC did not repossess or liquidate the Equipment but rather "abandoned it to the detriment of the Debtor." Motion ¶ 9.[4] Had GALC liquidated the Equipment, Debtor postulates that it would have received $225,000, the value of the Hercules offer versus the $125,000 GALC is crediting against its claim as a result of the Bank settlement. The underlying premise of Debtor's legal position is that the Lease is governed by Article 9 of the Uniform Commercial Code ("UCC") relating to leases intended as security and not UCC Article 2 relating to true leases. As such, it claims that GALC was bound by notions of commercial reasonableness to dispose of the Equipment and to provide notice of sale to the Debtor and Capano, the latter of whom contends he would have exceeded the Bank's offer if so notified.

In response, GALC contends that the Debtor has treated the parties' contract as a true lease in the Chapter 11 case and is equitably and judicially estopped to do otherwise now in order to impose an Article 9 duty to dispose of the Equipment in a "commercially reasonable manner."[5] It refers to the plain language of the Lease which provides GALC with an unfettered right to recover its damages under the Lease without any concomitant duty with respect to disposition of the Equipment. Moreover, it contends that given the Bank's obstruction of its good faith attempt to perform the proposed Capano

---

4. From this assumption, the Motion concludes that GALC's failure to liquidate the Equipment constitutes a waiver, release and abandonment of any right it may have to receive payment as an unsecured creditor under the Plan. This position was modified in the hearing where the Debtor concedes that the claim should be reduced to $70,000 ($295,000 minus $225,000) not expunged.

5. GALC also argues that Debtor is collaterally estopped from disputing the Lease claim by reason of a prepetition judgment entered by the Superior Court of New Jersey. However, as that judgment has not been made part of the record of the Motion, that contention fails for lack of evidence.

sale transaction, it easily satisfied UCC Article 2's commercial judgment standard which governed its conduct. Finally, it argues that even if Article 9 were applicable, its disposition of the Equipment through the Bank settlement does not bar it from asserting a deficiency claim because it would not have realized a greater amount for the Equipment through an Article 9 sale.

## DISCUSSION

▮ The Motion is premised on the treatment of the Lease as a security transaction, and Debtor seeks a predicate conclusion of law to that effect based on the characteristics of the Lease (*i.e.*, the purchase option for nominal consideration at the conclusion of the Lease term) and its view that by claiming only a deficiency claim, it has acknowledged the Debtor's equitable interest in the Equipment. Memorandum of Law in Support of Motion at p. 3–5 (unnumbered). GALC does not engage in the true lease versus financing lease debate rather contending that such consideration is foreclosed by Debtor's conduct in the bankruptcy case where it views the Lease has always been treated as a true lease. Memorandum of Law in Opposition to Motion at 4–12. However, since GALC also contends that its claim is unaffected even if the Lease is governed by Article 9, I turn to that issue first as it has the potential of making resolution of the estoppel and characterization issues unnecessary.

Assuming, without deciding, that the Lease is governed by Article 9 of the Uniform Commercial Code, the applicable sections are, as GALC notes, 9–610, 9–611 and 9–626 as adopted in New Jersey. N.J.S.A. 12A:9 *et seq.* Notably New Jersey enacted revised Article 9 in 2001, including the new section 9–626 dealing with a non-consumer action in which a deficiency is in issue, and it applies to the instant matter. N.J.S.A. 12A:9–702(a) (Act applies to a transaction or lien within its scope even if the lien or transaction was entered into or created before the Act took effect). Article 9 requires a secured party upon default to dispose of its collateral in a commercial reasonable manner, 12A:9–610(b), and to provide notice of any disposition to the debtor and any secondary obligor, 12A:9–611. While the commercial reasonableness of the disposition of the Equipment to Bank for $125,000 is subject to dispute, there is no question but that GALC failed to provide notice of the disposition to the Debtor and Capano and therefore was not in compliance with Article 9 to the extent it applied. Debtor contends that such conduct absolutely bars the deficiency claim being asserted by GALC. I respectfully disagree.

Prior to the promulgation of UCC 9–626, courts were divided on the consequences of non-compliance with the Article 9 proscriptions for disposition of collateral.

> Three general approaches emerged. Some courts have held that a noncomplying secured party may not recover a deficiency (the 'absolute bar' rule). A few courts held that the debtor can offset against a claim to a deficiency all damages recoverable under former Section 9–507 resulting from the secured party's noncompliance (the 'offset' rule). A plurality of courts considering the issue held that the noncomplying secured party is barred from recovering a deficiency unless it overcomes a rebuttable presumption that compliance with former Part 5 would have yielded an amount sufficient to satisfy the secured debt.

Official Comment 4 to Revised UCC § 9–626. A review of the New Jersey case law indicates that its courts were in the latter category. *Security Savings Bank, SLA v. Tranchitella*, 249 N.J.Super. 234, 244, 592

A.2d 284, 290 (1991) (recognizing divergent approaches and finding that applying a rebuttable presumption "gives more appropriate recognition to the interests of both parties because it permits consideration of the facts in each unique matter"). In *Caterpillar Financial Services Corp. v. Wells*, 278 N.J.Super. 481, 651 A.2d 507 (1994), like here, no notice was given of a private sale. The Court stated:

> When no notice is given of a sale, the governing law in New Jersey is that set forth in *Block v. Diana*, 252 N.J.Super. 650, 657–58, 600 A.2d 520 (App.Div. 1992), certif. denied, 127 N.J. 564, 606 A.2d 375 (1992):
>
>> New Jersey ... follows the rule that failure to give notice of sale will not deprive a secured party of all rights to recovery of a deficiency judgment ... Our rule in such cases is that there is a rebuttable presumption that the collateral was worth the amount of the debt, and that the creditor will have the burden of showing that a commercially reasonable sale of the collateral would have yielded less than the balance due. [citations omitted].

*Id.* at 504, 651 A.2d at 519. Revised Article 9 codified the rebuttable presumption approach followed by New Jersey. 12A:9–626. Thus, while I agree with GALC that it is not barred from recovery of a deficiency judgment by reason of its failure to provide notice of sale or to dispose of the equipment in a commercially reasonable manner, the cases that predate the adoption of revised Article 9 which employ the same standard are still very much instructive in determining its right to allowance of an unsecured claim. In New Jersey, the new N.J.S.A. 12A:9–626 merely follows existing case law.

Applying the unique facts of this case to the requirements of commercial reasonableness imposed by the Uniform Com-

mercial Code, I conclude that GALC has rebutted the presumption that notice to Debtor and Capano and a public or private sale of the Equipment to Bank would have yielded an amount equal to the balance due. Section 9–611, formerly N.J.S.A. 12A:9–504(3), requires notice in order "to give all persons having an interest in the collateral an opportunity to bid at the sale, safeguard his right of redemption and reduce his potential liability." *Tranchitella*, 249 N.J.Super. at 240, 592 A.2d at 288. Capano testified that had he been provided notice, he would have offered in excess of the price paid by Bank and mitigated GALC's claim against both the Debtor and himself. I find this argument to be disingenuous. Capano did have the opportunity to purchase the Equipment and indeed found Hercules who would buy it for $225,000 and structured a transaction where he would make the offer as Hercules' ghost. However, the sale was expressly conditioned on delivery of the Equipment to Hercules, a condition that Capano would not waive to secure the Equipment on his own behalf with the funds nominally escrowed by his son. Thus, Capano's testimony that the value of the Equipment was established by the ready, willing and able buyer he secured is belied by the reality that the Bank was adamantly refusing to release the Equipment and neither Hercules nor Capano was prepared to consummate a sale without delivery which GALC could not assure. Rather GALC was compelled to engage in protracted litigation in two jurisdictions against the Bank in an effort to recover the Equipment. During this period the Debtor took the position it had no interest in the outcome, sitting back until GALC filed its deficiency claim. With the time and cost of the court fights adding to its claim, GALC exercised its business judgment to negotiate a settlement with the Bank that

would accomplish the release of the Equipment.

Capano points to the Hercules transaction as the measure of value of the Equipment. I disagree. The $225,000 offer was the value of the Equipment *delivered.* By establishing that it was unable to deliver the Equipment to any buyer, the value of the Equipment could only be measured by the cost of securing its release from the Bank either through a continuation of the litigation or through a settlement. What a third party would pay would only be relevant if delivery was not a condition of the sale. Since continued litigation of necessity would impose time, cost and risk reducing the ultimate value to be realized from disposition of the Equipment, GALC's decision to settle with the Bank in order to secure the Equipment or its value was sound. Given GALC's self interest and its inability to fully recover on an unsecured claim against the Debtor, GALC was motivated to achieve the highest amount for the Equipment as part of the settlement. This Court has no basis to question that business judgment and accordingly finds that the $125,000 it received was the highest and best value it could have under the circumstances. This amount will be applied to reduce GALC's claim of $295,000 and GALC will be allowed a $170,000 unsecured claim in this Chapter 11 case.[6]

An Order consistent with the foregoing Memorandum Opinion shall be entered.

### Order

AND NOW, this 10th day of January 2005, upon consideration of the Debtor's Motion to Expunge Claims of Great American Leasing Corporation (the "Motion"), after notice and hearing, and for the reasons stated in the foregoing Memorandum Opinion;

It is hereby **ORDERED** that the Motion is **DENIED**.

---

6. Having so concluded, it is not necessary for me to reach the Lease characterization issue and determine whether Debtor is estopped from contending that the Lease is a true lease.