252 N.J. Super. 650 (1992)
600 A.2d 520
LOUIS BLOCK AND EDWARD BLOCK, PLAINTIFFS-RESPONDENTS-CROSS-APPELLANTS,
v.
FRANK E. DIANA, DELORES DIANA, AND MICHAEL PIZIO, DEFENDANTS-APPELLANTS-CROSS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 20, 1991.
Decided January 7, 1992.
*651 Before Judges KING, DREIER and BROCHIN.
David J. Frizell argued the cause for appellants (Frizell, Pozycki & Meiser, attorneys; Eric A. Litvak, on the brief).
Edward M. Sullivan argued the cause for respondents (McDonough & Sullivan, attorneys; Edward M. Sullivan, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
The parties have cross-appealed from orders of two judges who have heard portions of this matter. Defendants, Frank E. Diana, Delores Diana and Michael Pizio, appeal from the judgment in favor of plaintiffs, Louis Block and Edward Block, in the amount of $19,336.26. Plaintiffs cross-appeal, contending that an earlier judgment entered in their favor in this case by a different judge in the amount of $57,931.23 (plus $35,482.26 interest) should not have been vacated and a new trial ordered. While plaintiffs press their cross-appeal, they state that defendant's notice of appeal was untimely and the matter is therefore not properly before us. We will discuss that issue; but to put it into context, we must first outline the tortuous procedural route this case has taken.
The transaction giving rise to the parties' claims is simple to explain. Plaintiffs sold to defendants their liquor store, Blocks Market, located at 336 South Second Street in Dunellen, New *652 Jersey for $100,000.[1] Included in the sale was a liquor license owned by the sellers. The purchasers paid $29,000 down and executed a promissory note for the balance of $71,000. While the purchasers signed the notes individually, the actual purchaser was listed as "Blocks Liquor Market Ltd.," a New Jersey corporation. The note was secured by a security agreement on all of the physical assets, and a transfer in escrow of the stock in the corporation owning the physical assets and the liquor license. The purchasers also agreed to lease the liquor store premises on a renewable one-year lease for $550 per month. The stock escrow agreement required the stock of the corporation to be held by the sellers' law firm until the note was satisfied. The agreement contained the following terms:
In the event the Purchasers are unable to pay the Sellers off, then the Sellers shall be entitled to force a sale or to exercise their rights by way of repossession under the terms of the escrow agreement. However, it is expressly understood that the Purchasers shall have the opportunity as outlined to pay off the Sellers in order to avoid the loss of their investment.
From 1976 until the early 1980's defendants ran the business and made the required payments under the note. When they sensed that the business was no longer profitable, they attempted to find potential buyers, dealing at all times with plaintiffs' attorney. Tentative arrangements were made under which defendants would bring the arrearages up to date; interest on the loan would continue as 8 1/4% (it was later amended to increase the interest to 13 3/4%); the amount on the lease would increase from $550 to $650 per month; the new buyers would help defendants run the store and produce capital as needed to run the business; and once the store was "made whole," plaintiffs and the new buyers would negotiate concerning the buyers taking over the business.
These terms obviously were not agreeable to plaintiffs, since on May 20, 1982 they notified defendants that they were in default. They demanded that the stock certificates be endorsed *653 to them (thus effecting a retransfer of the liquor license) and possession of the business in their building returned to the sellers. Defendants complied with this demand in all respects. The sellers, however, did not physically reenter and take over the business. The market was merely closed.
Over four and one-half years later, on December 19, 1986, plaintiffs filed a complaint against the individual defendants demanding the balance due on the note plus interest from the date of the last payment. Two years later on October 18, 1988 when the matter was approaching trial, plaintiffs moved to amend their complaint to add a demand for $14,602.52 which plaintiffs allegedly were compelled to pay as "indebtedness attached to that license which had been incurred by the defendants as a result of their nonpayment of suppliers' bills." In an accompanying certification they stated that these monies "were expended by plaintiffs to `clear' the liquor license of the obligations which attached to it as a result of the indebtedness of the defendants." These obligations were asserted to have "resulted from [defendants'] non-payment of suppliers' bills, and as a result thereof the liquor license could not be sold until these matters were disposed of."[2]
*654 Plaintiffs decided to pay off the "lien" to the suppliers in August 1983 even though they did not then have a buyer for the license or the business. The Assignment Judge determined that plaintiffs' motion to amend the complaint had been made too late, and the request was denied on November 15, 1988.
The first of the trials of this matter was held before the initial trial judge on December 9, 1988. On December 23, 1988 in his oral decision he stated that plaintiffs had a right to full payment on the note from the individuals who guaranteed it, and that plaintiffs had no legal duty to cooperate in the buy-out of the business by the potential purchasers whom defendants had introduced to them. Judgment was therefore entered in the amount of $57,931.23 plus interest to the date of the last payment.
Defendants then moved for reconsideration, and on April 18, 1989 the judge vacated the original judgment and ordered a new trial. However two months later on June 12, 1989, he entered judgment against the defendants in the amount of $93,415.49. On July 14, 1989 he vacated his June 12, 1989 order and again ordered a new trial.
The second trial was held before a new judge on May 22nd and on May 29, 1990. After an oral decision made on the final day of trial, a written decision was entered June 14, 1990 in which the judge denied plaintiffs' claim on the note. Specifically, he found that defendants met their duty to mitigate damages by presenting good faith purchasers ready, willing and able to purchase the business and license. Although plaintiffs claimed in the new trial that their lawyer had vetoed the new *655 arrangement, the judge determined that plaintiffs themselves had refused to cooperate.
Without reference to the assignment judge's 1988 denial of plaintiffs' motion to amend the complaint to assert a claim for the sums expended to pay the suppliers and remove the "liens" on the license, the judge reinstated this claim. Louis Block in his testimony quantified the claim to be "around $10,000."[3] The judge stated as his reason for entering the judgment (limited to this claim) that a "plaintiff is always entitled to recover those amounts of money not included in the terms of the contract which he assumed or necessarily expended to protect the value of the collateral." He thus entered the judgment for $9,473.73 plus legal interest since 1983, or a total of $19,336.20.
Although the judgment was initially entered June 14, 1990, the judge considered plaintiffs' application for a new trial and defendants' application for reconsideration. On July 20, 1990 the judge rescinded his June 14, 1990 order for judgment, denied plaintiffs' application for a new trial, and granted defendants' application for reconsideration. On September 20, 1990, however, the June 14, 1990 judgment was reinstated by a consent order and the interim orders were vacated. Defendants filed their notice of appeal October 26, 1990.[4]
*656 Defendants contend they should not be responsible for the sums paid by plaintiffs for the wholesalers' bills. Plaintiffs on the other hand contend that defendants not only were responsible for the wholesalers' bills (even if they were not "liens"), plus interest, but also that the original judgment should not have been vacated by the first judge who heard the case. Unfortunately, we have been given no reasons for any of the actions taken by the first judge, since no oral or written explanations were given at that time.
We have recounted the history of the case in detail primarily to show why we will depart from the procedural claims; deal solely with the legal ramifications of the parties' acts; and end this matter. Whatever labels the parties may have placed upon this transaction, it clearly was a sale of a business in which the sellers retained a security interest to secure a portion of the purchase price. Upon default by the purchasers, the sellers had the right to demand possession of their collateral, and they did so. The purchasers complied. At that time the balance due on the original $79,000 promissory note had been reduced to $57,931.23. In addition, if we accept the unpaid bills to liquor wholesalers as a bona fide indebtedness of the corporation that owned the liquor license and as impeding the transferability of the collateral, the total amount due was $67,404.96. Defendants had contracted to pay approximately $110,000 for the business and liquor stock (assuming the liquor stock on hand was worth about $10,000). Thus they had paid $42,595.04 to date when they returned the security to plaintiffs.
At that point, if the sellers were to comply with the Uniform Commercial Code, they had the choice of retaining their collateral in full satisfaction of the debt, in effect a strict foreclosure of the security interest in the personal property, *657 N.J.S.A. 12A:9-505(2), or selling the collateral and holding defendants for any deficiency, N.J.S.A. 12A:9-504. If there is to be a sale, N.J.S.A. 12A:9-504 requires that the sale, public or private, be held in a commercially reasonable manner, and that the secured party give reasonable notice to the borrower of the time and place of the proposed sale. Security Sav. Bank v. Tranchitella, 249 N.J. Super. 234, 239-240, 592 A.2d 284 (App. Div. 1991). There is no question that plaintiffs held no sale. This inaction was explained by them by recounting that they had listed the business with various brokers, but had not received any offers. The trial judge determined, however, that they had received at least one bona fide offer for a private sale, but had rejected it.
Not only did plaintiffs fail to comply with the applicable sale provisions of the Uniform Commercial Code, they also failed to comply with the provision entitling them to retain the collateral. In B.J.L. Leasing Corp. v. Whittington, Singer Davis & Co., 204 N.J. Super. 314, 498 A.2d 1262 (App.Div. 1985), the creditor had retaken the collateral (a Mercedes), and also had attempted to hold the defendant liable for the deficiency on the note. We there stated:
A creditor cannot retain collateral under N.J.S.A. 12A:9-505 until he has first notified the debtor of his proposal to do so and twenty-one days have passed from this proposal without the debtor objecting to it in writing. Here plaintiff has not made such a proposal, and it seems certain that if he did, defendant would object. Plaintiff cannot, as ordered by the trial court, obtain its deficiencies and retain the vehicle.
Id. at 321-322, 498 A.2d 1262 (emphasis added).
New Jersey, however, follows the rule that failure to give notice of sale will not deprive a secured party of all rights to recovery of a deficiency judgment, although the contrary is the rule in approximately half the jurisdictions that have considered the problem. Our rule in such cases is that there is a rebuttable presumption that the collateral was worth the amount of the debt, and that the creditor will have the burden of showing that a commercially reasonable sale of the collateral would have yielded less than the balance due. See Security Sav. Bank v. *658 Tranchitella, supra, 249 N.J. Super. at 244, 592 A.2d 284; Conti Causeway Ford v. Jarossy, 114 N.J. Super. 382, 386, 276 A.2d 402 (Cty.Dist.Ct. 1971), affirmed o.b., 118 N.J. Super. 521, 288 A.2d 872 (App.Div. 1972); Midlantic Nat'l Bank v. Coyne, 222 N.J. Super. 649, 657, 537 A.2d 798 (Law Div. 1987); Franklin State Bank v. Parker, 136 N.J. Super. 476, 481, 346 A.2d 632 (Cty.Dist.Ct. 1975); T & W Ice Cream, Inc. v. Carriage Barn, Inc., 107 N.J. Super. 328, 337, 258 A.2d 162 (Cty.Ct. 1969). Such a rule pertains, however, only if there has been a sale which the purchasers wish to prove was commercially reasonable, and they fail to give notice. See e.g., Security Sav. Bank v. Tranchitella, supra. It does not apply where the sellers have retained the property for years in apparent satisfaction of the debt, and have permitted the purchasers to proceed with their lives in total ignorance of any deficiency claim being asserted by the sellers.
In New Jersey we have not yet defined a "constructive strict foreclosure" of personalty, a subject not specifically covered by Chapter 9 of the Uniform Commercial Code. We could opt for the majority rule followed and explained in Lamp Fair, Inc. v. Perez-Ortiz, 888 F.2d 173 (1st Cir.1989). Under this rule, the retention of the collateral for a lengthy period would constitute a retention in satisfaction of the debt under N.J.S.A. 12A:9-505(2).[5] The better-reasoned rule, however, is that delay alone will not create a conclusively presumed invocation of section 9-505(2), but rather a liability for the debtor's losses analogous to that imposed under N.J.S.A. 12A:9-507(1). See, e.g., Warnaco v. Farkas, 872 F.2d 539 (2d Cir.1989). This approach would yield similar results to the rebuttable presumption we applied in the failed notice cases discussed earlier.
*659 Here, over four and one-half years passed before plaintiffs asserted their claim. If we permitted such a claim, the only remedy defendants would have is to object to the commercial reasonableness of a sale that was never held, or to demand a sale of collateral, part of which no longer exists. The license lapsed since the sellers did not either operate the business or effect a sale within the required period to keep it active. Defendants' rights had become so ineffectual that we cannot expect them to have attempted to assert them.[6] Thus, the result is the same here whether we follow the conclusive presumption strict foreclosure rule, or the rebuttable presumption rule which we have applied in the failed notice cases.
Plaintiffs also claim that they have an independent right to payment for amounts that they expended to clear the debts which would have affected the license. They point to N.J.S.A. 12A:9-504(1) which permits them to receive, they claim, expenses such as the satisfaction of this lien. What they neglect to note, however, is that this section applies to the allocation of the proceeds of sale after compliance with the Uniform Commercial Code. In this case plaintiffs failed to sell the collateral, in a commercially reasonable manner or otherwise. They did not even take advantage of the ready, willing and able purchasers that defendants had introduced to them. Furthermore, in Louis Block's testimony he stated that although he had no idea what the collateral, including the license, was worth when it was returned, "it was worth the balance of the note." Holding defendants to any deficiency under these circumstances would be highly inequitable.
*660 The judgment appealed from is reversed. The complaint is dismissed.
NOTES
[1] The purchasers also were obligated to pay an additional amount up to $10,000 for any saleable stock of the business at the time of transfer.
[2] We note that notwithstanding a claim that there was a lien on the license, N.J.S.A. 33:1-26 provides:

Under no circumstances, however, shall a license, or rights thereunder, be deemed property, subject to inheritance, sale, pledge, lien, levy, attachment, execution, seizure for debts, or any other transfer or disposition whatsoever, except to the extent expressly provided by this chapter.
See Route 73 Bowling Center Inc. v. Aristone, 192 N.J. Super. 80, 83-84, 469 A.2d 85 (App.Div. 1983). Cf. Darrah Foods Services, Inc. v. Lambertville House, 202 N.J. Super. 447, 453, 495 A.2d 438 (App.Div. 1985), certif. denied, 102 N.J. 329, 508 A.2d 207 (1985). We are at a loss to understand what lien on the license had to be cleared before the license could be transferred, as no authority for such lien is apparent in the alcoholic beverage law, N.J.S.A. 33:1-1 et seq. or the regulations promulgated pursuant thereto, N.J.A.C. 13:2-1 et seq. Plaintiff Louis Block testified that he did not think he was "aware of the October of 1981 law that stated that we had to pay the bills or whoever had the license had to have the clean bill of health to sell." The sellers' attorney testified that he had no knowledge of anyone who had a lien on the license, but that the suppliers considered whomever held the license to be responsible and demanded payments on a C.O.D. basis until these debts were cleared. While this may not have been a formal lien, he agreed that by payments to the suppliers the "lien" would be satisfied. While we conclude that there was no actual lien on the license, there was a debt owed by the corporation which owned the license. It was reasonable for the sellers to pay off these debts, since absent such payment, the creditor liquor wholesalers would not deliver to the holder of the license except on a C.O.D. basis.
[3] It is difficult for us to see from this record how the exact amount of $9,473.73 was determined; we can only assume that it appeared in an exhibit that has not been supplied to us.
[4] Plaintiffs' initial point is that the notice of appeal was untimely filed. Whatever may have been the problems with the timeliness of orders entered, we note that the order of September 20, 1990 reinstating the judgment was a consent order. Plaintiffs' counsel consented "to the form and entry of the above Order;" defense counsel consented to the form, but did "not consent to its content or entry." Plaintiffs' counsel's consent to the September 20, 1990 reinstatement order estopped plaintiffs from objecting to the timeliness of the October 26, 1990 notice of appeal. Defendants time to appeal from the order finally entering judgment against them did not expire until November 5, 1990. Insofar as plaintiffs claim that interim applications for reconsideration, new trials or the like were untimely, defendants assert that they acted as soon as orders were available to them. They claim that while orders may have contained a particular date, they often were not received by them until weeks later.
[5] Even this rule is not generally applied where the creditor rather than the debtor asserts such strict foreclosure. See Brown v. Baker, 688 P.2d 943, 951, n. 5 (Alaska 1984).
[6] Had there not been this extended delay, there may have been cause to follow the suggestion of Judge Yanoff in Midlantic Nat'l Bank v. Coyne, supra, 222 N.J. Super. at 653-658, 537 A.2d 798 and permit plaintiffs to reconstruct what would have happened had they acted in a commercially reasonable manner. Under the circumstances before us, however, plaintiffs have not only failed to follow the dictates of the Uniform Commercial Code, but also have so slept on their rights as to be guilty of laches.