652 A.2d 749

TROOPER INK CO., INC., PLAINTIFF-RESPONDENT, v. JOHN H. WARREN AND ROICO, INC., DEFENDANTS-APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued November 1, 1994—Decided February 3, 1995.

258

Before Judges BRODY, ARNOLD M. STEIN and PAUL G. LEVY.

*John R. Altieri* argued the cause for appellants (*Mr. Altieri,* on the brief).

*Steven I. Adler* argued the cause for respondent (*Cole, Schotz, Meisel, Forman & Leonard,* attorneys; *Mr. Adler,* on the brief).

PAUL G. LEVY, J.A.D.

Plaintiff, assignee of a secured creditor, was awarded a summary judgment against guarantors of the underlying debt for an apparent deficiency between the debt and the collateral. We reverse and remand the matter for trial to resolve the various factual and legal issues concerning the disposition of the collateral and the legal effect thereof.

Ranger Products, Inc. (Ranger), a wholly owned subsidiary of Roico, Inc. (Roico), executed five promissory notes in favor of National State Bank, in the total amount of $500,000. The notes were guaranteed by defendants Roico and John Warren, the Chairman and CEO of Roico. As further security, Roico granted the bank a blanket security interest in the debtor's inventory, accounts receivable and other assets. On March 15, 1985, Ranger filed for reorganization under Chapter 11 of the Bankruptcy Act.[1] 11 *U.S.C.A.* § 301. The bank filed a complaint in the bankruptcy court to establish its liens and to have Ranger provide adequate protection to the bank for the debt. Ranger and Touch–N–Print, as debtors in possession, applied for authorization to use the collateral in the ordinary course of their businesses, and in a consent order dated May 2, 1985, the bankruptcy court granted the bank a super-priority status as to its perfected interest in Ranger's tangible and intangible assets. *See* 11 *U.S.C.A.* § 507. The court also ordered Ranger to pay the bank $6,013 per month as to one note of $250,000 and to pay current interest on the other four notes. So long as these payments were made, Ranger was permitted to use the accounts receivable and inventory in the normal course of its business. In the event of a default, the order provided that "the secured party may move before this Court for

---

[1] Additionally, another wholly owned subsidiary of Roico, Touch–N–Print, Inc., sought relief by reorganization. The two estates were administered jointly.

relief from the Automatic Stay to allow it to foreclose on its security interest provided herein."

Shortly thereafter, in July 1985, plaintiff Trooper Ink Co., Inc. (Trooper) was incorporated. Trooper contracted with Ranger to lease space, buy materials and lease machinery.

Upon a motion, a trustee was designated by the United States Trustee and approved by the bankruptcy judge in the Chapter 11 proceedings. The Trustee negotiated a purchase of Ranger's operating assets to Trooper for $100,000 plus the appraised value of the inventory, the cash value of the accounts receivable and certain other payments made by Trooper. The Trustee entered into an agreement for such sale on September 4, 1986, subject to bankruptcy court approval.[2] The bank objected to this proposed sale because part of the proceeds were to be paid to the landlord instead of to the bank, and the bank demanded a public sale of the assets. The Trustee then sought direction from the bankruptcy court as to how to proceed with a sale of the assets.

Before the court acted on the Trustee's request for direction, the bank negotiated directly with Trooper and, on October 2, 1986, made an agreement to assign its secured position and super-priority status to Trooper for $110,000. Thereafter, Trooper filed a motion for relief from the automatic stay and "granting reclamation." The guarantors objected to that assignment, seeking to have the bankruptcy court set it aside and also to reject the earlier proposed $100,000 sale.

On December 11, 1986, the bankruptcy court entered an "Order Vacating Automatic Stay and Granting Reclamation." The order specified that "Trooper ... [was] granted reclamation of the assets covered by its security interest ... as more specifically set forth in the order of May 2, 1985," and that the automatic stay imposed by 11 *U.S.C.A.* § 362 was vacated. The court also

---

[2] The agreement defined the operating assets as including inventory, furniture, fixtures, machinery and equipment, accounts receivable, leasehold improvements, and generally all tangible and intangible assets.

reserved decision as to Trooper's liability for paying expenses of administration and other existing claims against Trooper or the bank. Preliminarily, the order recited that the Trustee learned of the $110,000 assignment agreement and was advised by Trooper that Trooper demanded "reclamation of the items covered under the security agreement held by [the bank] and subject to the assignment." It also recited that the payments required under the May 1985 order were delinquent.

Trooper chose to collect the balance due on the notes from the guarantors and brought the within action in the Law Division, eventually moving for summary judgment.[3] Considering plaintiff's emphatic argument that the bankruptcy court intended to approve of a sale of Ranger's assets to Trooper, rather than only a disposition of the bank's rights to the assets, the motion judge was concerned about the meaning of the December 1986 order. Accordingly, the judge convened a limited fact-finding hearing pursuant to *R.* 4:46–3(b) and *R.* 4:67–5, "to ascertain whether the [order] entered by the [bankruptcy court] was an Order entered in a judicial proceeding approving the disposition by and between [the bank] and Trooper and thereby conclusively establishing the commercial reasonableness of the disposition pursuant to *N.J.S.A.* 12A:9–507(2)."

At the conclusion of the hearing, the judge did not make specific factual findings, but the colloquy between the judge and counsel indicates that the judge determined the December 1986 order effected a sale of Ranger's assets, meaning the secured collateral, to Trooper. Plaintiff's motion for partial summary judgment was granted, and judgment was entered against the guarantors for $671,991.89 as of October 10, 1992, with interest accruing thereafter. The judge found that the guarantors participated in the

---

[3] The within matter was consolidated with an earlier action brought by Roico against Trooper. Therefore, the motion which disposed of the collection of the amount due on the notes was actually for partial summary judgment. We have treated the judgment as final per *R.* 4:42–2(1) as a complete adjudication of a separate claim.

proceeding leading to the order, and that participation afforded them the presumption of commercial reasonableness. That finding correctly states the legal principle underlying *N.J.S.A.* 12A:9–507(2) which provides that "[a] disposition which has been approved in any judicial proceeding . . . shall conclusively be deemed to be commercially reasonable. . . .". *See Bryant v. American Nat. Bank & Trust Co.,* 407 *F.Supp.* 360, 364–65.(N.D.Ill.1976) ("If the approval [of a disposition of the collateral] emanates from a full and fair hearing, a court which 'collaterally' reviews the disposition's reasonableness should not attempt to further investigate the individual aspects of the sale. . . ."). *Compare F.D.I.C. v. Forte,* 94 *A.D.*2d 59, 463 *N.Y.S.*2d 844, 849 (1983) (there had been no judicial approval of a disposition because the judgment directing the sale "merely prescribed the form of the sale and not the manner in which it was to be conducted").

In determining that all parties had an opportunity in the bankruptcy court to discuss the terms of the alleged sale of the collateral, the motion judge did not express a consideration of the relationship of the May 1985 and the December 1986 orders. The May 1985 consent order set the procedure to be followed in case of default. It directed the bank, as the secured party, to move for vacation of the automatic stay so it could foreclose on its security interest. When the bank assigned its security interest to Trooper in October 1986 for $110,000, it did not own the collateral *per se,* only the right to dispose of it pursuant to the terms of the security interest and the Uniform Commercial Code. As assignee, Trooper was bound by the automatic stay, but the May 1985 order directed the path to relief. That path led to the December 1986 order.

The automatic stay "operates to prevent the commencement or continuation of any judicial, administrative, or other proceeding against the debtor." *Browning v. Navarro,* 743 *F.*2d 1069, 1083 (5th Cir.1984). "A party in interest who desires to pursue his pending but stayed action may file a complaint or motion in the bankruptcy court for relief from the automatic stay to proceed with his cause." *Ibid.* The statute gives the bankrupt-

cy court authority to grant relief from the stay by terminating, annulling, modifying or conditioning the stay. 11 *U.S.C.A.* § 362(d). Thus the court has the flexibility and the discretion to fashion the relief to the circumstances of the matter. *See e.g., Bankruptcy Est. of B.J. McAdams, Inc. v. Ralston Purina Co.,* 154 *B.R.* 809, 811 (N.D.Ga.1993) (citing *Browning v. Navarro, supra* at 1074).

In a matter where the court considered the nature of a motion to vacate the stay, distinguished from a complaint for reclamation, the Court of Appeals said, in pertinent part:

> ... an application to vacate a stay is defensive in nature. It does not seek affirmative relief from the bankruptcy court but asks to remove a bar to the secured creditor's proceeding elsewhere. If the bankruptcy court vacates its stay the secured creditor must litigate his claim elsewhere and if it prevails seek enforcement of its judgment elsewhere.
>
> [*Matter of Roloff,* 598 *F.*2d 783, 787 n. 18 (3rd Cir.1979).]

The bankruptcy judge did not specify any conditions modifying the automatic stay in the December 1986 order, he merely terminated it. Trooper had taken the place of the bank by assignment (the $110,000 agreement), and the order merely vacated the automatic stay. The use of the language "Trooper ... as assignee of [the bank] be and the same is hereby granted reclamation of the assets covered by its security interest ... as more specifically set forth in the order of May 2, 1985," plainly means that without the automatic stay, Trooper, as assignee of the bank, was left to deal with the collection of the notes in the state courts and the disposition of the assets pursuant to *N.J.S.A.* 12A:9–501 to –507. For example, under the Uniform Commercial Code, after default on an obligation, a secured creditor can retain the collateral in satisfaction of the debt if it notifies the debtors or guarantors of this intention and there is no objection filed. *N.J.S.A.* 12A:9–505(2). If a debtor objects in writing, the secured party would be required to dispose of the collateral by sale. A sale may be either private or public, but every aspect of the sale, including the method, manner, time, place and terms must be "commercially reasonable." *N.J.S.A.* 12A:9–504(3). Pursuant to the terms of the

defendants' guarantees, they would be liable to Trooper for any deficiency remaining after a sale. *N.J.S.A.* 12A:9–504(2).

 Whether plaintiff had possession and use of virtually all of Ranger's assets or whether there was an actual sale of any part of the collateral, are material issues of fact to be resolved. *Block v. Diana*, 252 *N.J.Super.* 650, 600 *A.*2d 520 (App.Div.), *certif. denied* 127 *N.J.* 564, 606 *A.*2d 375 (1992). We conclude that the December 1986 order was granted pursuant to a procedure equivalent to a motion to vacate the stay, as contemplated in the May 1985 order, not one similar to a complaint for reclamation. The bankruptcy court was not making an adjudication of the rights of the parties to the collateral. These are separate and distinct issues which a bankruptcy judge would ordinarily treat uniquely. When the automatic stay was removed, Trooper was constrained to pursue the remedies available to a secured party. In the Law Division, the judge should have examined the facts concerning the possession and utilization of the collateral in terms of remedies available under the Uniform Commercial Code. Summary judgment should have been denied because unresolved material issues of fact existed. On remand the trial judge should determine what happened to the collateral and decide the legal effect of that disposition.

Reversed and remanded.