### In re THE SCORE BOARD, INC. and the Score Board Holding Corp., Debtors.

### Civil Action No. 99–259 JEI.

United States District Court,
D. New Jersey.

July 30, 1999.

Joseph E. Sales, Haekyoung Suh, Norris, McLaughlin & Marcus, Somerville, NJ, for Oxxford Express, Inc.

Mark E. Felger, Cozen & O'Connor, Philadelphia, PA, for the Score Board, Inc.

Steven R. Neuner, Neuner & Ventura, Marlton, NJ, for Kobe Bryant.

## OPINION

IRENAS, District Judge:

### I. BACKGROUND

During the Spring of 1996, Appellant Kobe Bryant ("Bryant"), then a seventeen-year old star high school basketball player, declared his intention to forego college and enter the 1996 lottery draft of the National Basketball Association. On May 8, 1996, The Score Board Inc. ("Debtor"), then a New Jersey based company in the business of licensing, manufacturing and distributing sports and entertainment-related memorabilia, contacted Bryant's Agent, Arn Tellem ("Tellem" or "Agent") in anticipation of making a deal with Bryant. In negotiations of a contract to market products using the Kobe Bryant name, the parties began to discuss compensation for Bryant, including the number of complimentary cards.

Following the initial negotiations, by letter dated May 10, 1996, Debtor and Bryant's father, former NBA star Joe "Jelly Bean" Bryant, agreed to increase the number of complimentary cards that Bryant was to receive to 1,000. On May 13, 1996, Tellem sent a letter to Debtor's Vice President, Michael A. Balser ("Balser"), indicating that the parties mutually agreed on several terms, such as the amount of complimentary cards, again referencing the parties intention to negotiate the formation of a contract.

In early July 1996, after the above negotiations, Debtor prepared and forwarded a signed written licensing agreement ("agreement") to Bryant. The agreement granted Debtor the right to produce licensed products, such as trading cards, with Bryant's image. Bryant was obligated to make two personal appearances on behalf of Debtor and provide between a minimum of 15,000 and a maximum of 32,500 autographs. Bryant was to receive a $2.00 stipend for each autograph, after the first 7,500. Under the agreement, Bryant could receive a maximum of $75,000 for the autographs.

In addition to being compensated for the autographs, Bryant was entitled to receive base compensation of $10,000. Moreover, Debtor agreed to pay Bryant $5,000, of the $10,000, within ten days following receipt of the fully executed agreement. Finally, Bryant was entitled to a $5,000 bonus if he returned the agreement within six weeks.

Bryant rejected the above agreement, and on July 11, 1996, while still a minor, Bryant made a counter-offer ("counter-offer"), signed it and returned it to Debtor. The counter-offer made several changes to Debtor's agreement, including the number of autographs. Bryant also changed the amount of prepaid autographs from 7,500 to 500.

Balser claimed that he signed the counter-offer and placed it into his files. The copy signed by Debtor was subsequently misplaced, however, and has never been produced by Debtor during these proceedings. Rather, Debtor has produced a copy signed only by Bryant.

On August 23, 1996, Bryant turned eighteen. Three days later, Bryant deposited a check for $10,000 into his account from Debtor. On or about September 1, 1996, Bryant began performing his obligations under the agreement, including autograph signing sessions and public appearances. He subsequently performed his contractual duties for about a year and a half.

By late 1997, Bryant grew reluctant to sign any more autographs under the agreement and his Agent came to the conclusion that a fully executed contract did not exist. By this time, Tellem became concerned with Debtor's financial condition because it failed to make certain payments to several other players. Debtor claims that the true motivation for Bryant's reluctance stems from his perception that he was becoming a "star" player, and that his autograph was "worth" more than $2.00.

On February 12 and 19, 1998, President and CEO of Debtor, John White, sent letters to Tellem hoping to formulate a

new and more inclusive contract with Bryant. During the course of these negotiations, Debtor maintained that a valid contract existed between the parties.

On March 17, 1998, Debtor sent Bryant a check for $1,130 as compensation for unpaid autographs. Bryant alleges that he was entitled to $10,130, not $1,130. The Bankruptcy Court found that Bryant was owed $10,130 and the check for $1,130 was based on a miscalculation.

On March 18, 1998, Debtor filed a voluntary Chapter 11 bankruptcy petition. On March 23, 1998, Tellem returned the $1,130 check upon learning of Debtor's financial trouble. Included with the check was a letter that questioned the validity of the agreement between Bryant and Debtor.

The letter directed Debtor to "immediately cease and desist from any use of" Kobe Bryant's name, likeness or other publicity rights. On March 31, 1998, Debtor insisted that a contract existed. Tellem told Debtor to, "immediately provide me with a copy of the signed contract between Kobe Bryant and [Debtor] to verify that a valid agreement exists between the parties." On April 15, 1998, Patrick Wucjik, Debtor's general counsel, replied, enclosing a copy of the contract signed by Bryant verifying that a valid agreement existed between the parties. This was Bryant's counter-offer, still not signed by anyone on Debtor's behalf. On April 20, 1998, Tellem stated that no contract existed because the counter-offer was never signed by Debtor and there was never a meeting of the minds. Tellem added that the counter-offer expired and that Kobe Bryant withdrew from the counter-offer.

Subsequently, Debtor began to sell its assets, including numerous executory contracts with major athletes, including Bryant. Bryant argued that Debtor could not do this, because he believed that a contract never existed. In the alternative, if a contract was created, Bryant contended that it was voidable because it was entered into while he was a minor.

On July 31, 1998, the Bankruptcy Court temporarily resolved this dispute by signing an order which approved break-up fees and bidding procedures, and authorized the sale of most of Debtor's assets under 11 U.S.C. § 363 to The Oxxford Express, Inc. ("Oxxford"). However, the Bankruptcy Court required that Bryant's consent be obtained before Debtor could assume and assign the Bryant contract. Alternatively, Debtor could assume and assign the contract after the entry of a final and non-appealable order adjudging that the assets of Debtor included a valid and enforceable executory contract with Bryant.

On August 6, 1998, Bryant filed a motion to vacate or to modify the automatic stay to permit him to repudiate the disputed contract by reason of infancy. On December 21, 1998, the Honorable Gloria M. Burns ruled in her memorandum opinion that Debtor accepted Bryant's counter-offer and, therefore, a valid contract existed between Bryant and Debtor. In the alternative, the Bankruptcy Court held that even if Bryant's counter-offer was not signed by Debtor, the parties' subsequent conduct demonstrated their acceptance of the contractual obligation by performance, thereby creating an enforceable contract. Judge Burns denied Bryant's claims of mutual mistake, infancy and his motion for stay relief.

On December 23, 1998, Debtor moved to assume several executory contracts, pursuant to 11 U.S.C. § 363, including the contract with Bryant, and assign them to Oxxford. On December 28, 1998, Bryant filed an objection, arguing that under the July 30, 1998, order, no assumption or assignment could take place until entry of a final non-appealable order, which did not yet occur. On December 29, 1998, the Bankruptcy Court granted Debtor's motion, subject to the terms and limitations of the July 31, 1998, order.

On December 29, 1998, Bryant filed a notice of appeal of Judge Burns' December 21, 1998, Order. On January 6, 1999,

Bryant amended his notice of appeal. He clarified that the appeal encompassed not only the adjudication of the Bryant dispute, but also the Bankruptcy Court's Order approving assumption and assignment of that contract and denying Bryant's motion for stay relief.

On February 2, 1999, the Bankruptcy Court entered its final orders: (1) granting Debtor's motion to assume its executory contract with Bryant and assign it to Oxxford; and (2) overruling Bryant's objection to the sale.

## II. STANDARD OF REVIEW

The standard of review applied by a district court when reviewing the ruling of a bankruptcy court is determined by the nature of the issues presented on appeal. Findings of fact are not to be set aside unless they are "clearly erroneous." *See* Fed.R. of Bankr.P. 8013; *In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 203 (3d Cir.1995); *J.P. Fyfe, Inc. v. Bradco Supply Corp.*, 891 F.2d 66, 69 (3d Cir.1989). Questions of law are subject to de novo or plenary review. *See In re Brown*, 951 F.2d 564, 567 (3d Cir.1991); *J.P. Fyfe*, 891 F.2d at 69.

## III. DISCUSSION

Bryant argues that this Court should reverse the Bankruptcy Court's Orders because: (1) there was never a signed contract tendered to Bryant; (2) Debtor's conduct did not constitute acceptance; (3) the Bankruptcy Court improperly shifted the burden of proof from Debtor to Bryant; and (4) Bryant cannot ratify a contract made while a minor because he did not have full knowledge of the facts. Finally, Bryant contends that even if a contract exists, the Bankruptcy Court incorrectly determined that there was not cause to lift the automatic stay to allow Bryant to void his contractual obligations. Having considered Bryant's arguments, this Court

finds that the Bankruptcy Court correctly determined that a contract existed and that there was no cause to lift the automatic stay. This Court will address each of Bryant's arguments in turn.[1]

### A.

Bryant contends that the Bankruptcy Court erred in its finding that there existed an enforceable contract. Specifically, Bryant argues that the court ignored: (1) the requirement that acceptance must be unequivocally communicated before a contract can be formed; (2) settled principles of contract construction; and (3) undisputed evidence of the record that Debtor and Bryant continued to disagree on the terms of their deal. For the following reasons, this Court finds that an enforceable contract was created.

 "[A] contract is an agreement resulting in obligation enforceable at law." *Borough of West Caldwell v. Borough of Caldwell*, 26 N.J. 9, 24, 138 A.2d 402 (1958). Where parties agree on essential terms and manifest an intention to be bound by such terms, an enforceable contract is created. *See Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435, 608 A.2d 280 (1992). "[I]t is requisite that there be an unqualified acceptance to conclude the manifestation of assent." *Id.* "[T]he manifestation of mutual assent is usually had by an offer and an acceptance either in words or by conduct." *Johnson & Johnson v. Charmley Drug Co.*, 11 N.J. 526, 538, 95 A.2d 391 (1953); *Weichert*, 128 N.J. at 436, 608 A.2d 280. ("An offeree may manifest assent to the terms of an offer through words, creating an express contract, or by conduct, creating a contract implied-in-fact"). "[C]onduct may take the place of written or spoken words in the formation of contracts[.]" *Johnson & Johnson*, 11 N.J. at 539, 95 A.2d 391. In order for there to be an operative accep-

---

**1.** Neither party disputes that the application of New Jersey contract law controls the issue at bar.

tance by acts or conduct, the offeree's assent to the offer, according to its terms, must be unequivocally shown. *Id.* at 538–39, 95 A.2d 391.

### 1.

■ Bryant argues that Debtor never demonstrated that it accepted the Bryant counter-offer because Bryant never received a signed copy from Debtor. The Bankruptcy Court found that despite Debtor's inability to produce a signed contract, a contract existed because Debtor allegedly signed the counter-offer made by Bryant and placed it in its files. This Court rejects the Bankruptcy Court's holding to the extent that it held that signing the counter-offer and placing it in the files constituted acceptance. While signing a document may demonstrate an intention to accept an offer, such acceptance is not effective until if and when it is conveyed to the other party. *See Hahn v. Vermont Law School,* 698 F.2d 48 (1st Cir.1983) (The First Circuit found that a formal signing was not sufficient in contract formation, rather, a court should focus on acts of conveyance such as the sending of information or a letter).

■ However, the recipient of an offer may communicate acceptance by means other than a formally signed contract. Performance of a contract's executory obligations can serve as acceptance even in the absence of any writing. *See, e.g., Lahue v. Pio Costa,* 263 N.J.Super. 575, 598, 623 A.2d 775 (App.Div.1993), *certif. denied,* 134 N.J. 477, 634 A.2d 524 (1993) ("it has consistently been recognized that part performance of an oral agreement may take the agreement out of the statute of frauds"). In this case Debtor mailed the $10,000 payment to Bryant which was required by the agreement, and both parties performed under the agreement for a year and a half. Bryant's acceptance of the $10,000 check and the parties subsequent performance were more than adequate to satisfy the offer and acceptance requirements of contract formation.[2] *See Johnson & Johnson,* 11 N.J. at 539, 95 A.2d 391; *Weichert,* 128 N.J. at 436, 608 A.2d 280.

### 2.

Bryant contends that two contractual clauses explicitly require Debtor to convey acceptance by a valid signature on the counter-offer. These clauses existed in both Debtor's offer and Bryant's counter-offer.

[paragraph 7]:

> Compensation. [ ]Athlete will receive a check for $5,000.00 within ten (10) business days following Company's receipt of the fully executed Agreement. Company also agrees to pay Athlete a $5,000.00 bonus (the "bonus payment") in the event that Athlete executes and delivers this License Agreement to Company within six weeks of the date first set forth ... The bonus payment, if payable, will be mailed to Athlete within ten business days following Company's receipt of the fully executed Agreement.

[paragraph 16]:

> Entire Agreement, Modifications and Amendments. [ ]This Agreement may only be amended or modified by the mutual agreement of the parties hereto. Any such amendments or modifications must be in writing and executed by the parties.

■ New Jersey law states that a writing must have "a reasonable interpretation." *See West Caldwell,* 26 N.J. at 25, 138 A.2d 402. "Disproportionate emphasis upon a word or clause or a single provision does not serve the object of interpretation." *Id.* A reasonably intelligent person should have the sense that specific words and phrases, "may be qualified by the context ... given the meaning that com-

---

2. The absence of Debtor's signature is more pertinent to a challenge under the statute of frauds. However, this is not before this Court because the contract is being enforced against the party that did in fact sign.

ports with the probable intention." *Id.; see also Mantell v. International Plastic Harmonica Corp.*, 141 N.J.Eq. 379, 55 A.2d 250 (E.& A.1947).

This Court finds that the clauses do not explicitly require the signatures of both parties as a condition precedent to the formation of a valid contract. Rather they give a time frame of when certain events will occur. Even if such clause could be read as argued by Bryant, the subsequent conduct of the parties clearly signified the intention of the parties to waive those requirements. *See, e.g., Selective Builders, Inc. v. Hudson City Sav. Bank*, 137 N.J.Super. 500, 505, 349 A.2d 564 (Ch.Div.1975) (finding that a party's failure to object when a condition was not satisfied and the party's conduct constituted a waiver of such condition).

### 3.

Bryant argues that the Bankruptcy Court erred in finding a valid contract because it ignored evidence that the parties continued to disagree on the terms of the deal. Specifically, Bryant contends that Debtor, although agreeing to the counter-offer, tendered Bryant a check for several thousand dollars less than what the stipulated terms required. Bryant asserts that the counter-offer made clear that only 500 autographs were prepaid and that he was entitled to additional $2.00 for every autograph beyond the first 500. It is undisputed that Bryant signed 5,565 autographs. Therefore, according to the counter-offer Bryant was entitled to receive $10,130. However, Debtor tendered a check for $1,130, $9,000 less than the amount required under the contract.

Bryant argues that Debtor's payment evidences their disagreement over an essential term of the contract and illustrates that there was no meeting the minds. The

Bankruptcy Court found that the tender of a check for $1,130 was not evidence of a conflict as to the terms of the contract. Rather, the Court held that the amount of the check was a simple miscalculation.

The Bankruptcy Court's findings are supported by the record. A review of the counter-offer demonstrates that Bryant changed the original offer by crossing out 7,500 and replaced it with 500 prepaid autographs. Furthermore, Debtor now admits that Bryant was entitled to $10,130 and the Bankruptcy Court has already found the $1,130 was the result of a miscalculation and not a legitimate dispute over a term in the contract.[3]

### B.

Bryant further contends that the Bankruptcy Court improperly shifted the burden of proof from Debtor to Bryant. Bryant argues that the burden of proving the existence of a valid contract lies on the party claiming the validity of the contract. Bryant contends that Judge Burns unfairly shifted the burden to Bryant by holding that the absence of a signed writing was not dispositive and that the check for $1,130 was simply based on a miscalculation.

This is simply an attempt by Bryant to reargue that the contract was not accepted and that the parties disputed material facts. This Court has already considered these arguments. However, this Court will note there was ample evidence in the record to support the conclusion that Debtor carried its burden of proving by a preponderance of the evidence the existence of a valid and enforceable contract.

In contract disputes, courts presume that parties voluntarily engage in an agreement that they intend to be binding. *See Cox v. Simon*, 278 N.J.Super.

---

**3.** At one point Debtor may have argued that the contract provided for 5000 pre-paid signatures. However, the Bankruptcy Court has already determined that the contract provided for only 500 signatures. This dispute is not significant enough to require a finding that there was no meeting of the minds. Upon examination of the contract, the Bankruptcy Court was easily able to resolve this dispute in favor of Bryant.

419, 429–30, 651 A.2d 476 (App.Div.1995). Thus, courts are required to "endeavor to find a fair and reasonable interpretation of the covenant, rather than render it completely void." *Id.* at 430, 651 A.2d 476. This Court finds that the Bankruptcy Court viewed the facts objectively and found that Debtor carried his burden of proving the existence of a binding contract.

## C.

■ Bryant challenges the Bankruptcy Court's finding that he ratified the agreement upon attaining majority. Contracts made during minority are voidable at the minor's election within a reasonable time after the minor attains the age of majority. *See Sacco v. Schallus,* 11 N.J.Super. 197, 201, 78 A.2d 143 (Ch.Div. 1950); *Notaro v. Notaro,* 38 N.J.Super. 311, 314, 118 A.2d 880 (Ch.Div.1955.).

The right to disaffirm a contract is subject to the infant's conduct which, upon reaching the age of majority, may amount to ratification. *See Notaro,* 38 N.J.Super. at 314, 118 A.2d 880. "Any conduct on the part of the former infant which evidences his decision that the transaction shall not be impeached is sufficient for this purpose." *Id.*

On August 23, 1996, Bryant reached the age of majority, approximately six weeks after the execution of the agreement. On August 26, 1996, Bryant deposited the $10,000 check sent to him from Debtor. Bryant also performed his contractual duties by signing autographs.

■ The Bankruptcy Court did not presume ratification from inaction as Bryant asserts. It is clear that Bryant ratified the contract from the facts, because Bryant consciously performed his contractual duties.

Bryant asserts that he acted at the insistence of his Agent, who believed that he was obligated to perform by contract. Yet, neither Bryant nor his Agent disputed the existence of a contract until the March 23, 1998, letter by Tellem. That Bryant

may have relied on his Agent is irrelevant to this Court's inquiry and is proper evidence only in a suit against the Agent. To the contrary, by admitting that he acted because he was under the belief that a contract existed, Bryant confirms the existence of the contract. Moreover, it was Bryant who deposited the check, signed the autographs, and made personal appearances.

## D.

■ Bryant argues the Bankruptcy Court further erred by failing to find cause for relief from the automatic stay provisions of 11 U.S.C. § 362(a). Bryant must show cause, in order to assert relief from the automatic stay. *See* 11 U.S.C. § 362(f). As the movant, Bryant has the initial burden of showing a legally sufficient basis, or cause, for lifting the automatic stay. *See Sonnax Indus., Inc. v. Tri Component Prods. Corp.,* 907 F.2d 1280, 1285 (2d Cir.1990). Cause is viewed as a broad and flexible concept. *See In re M.J. & K. Co., Inc.,* 161 B.R. 586 (Bkrtcy. S.D.N.Y.1993). "The court has the flexibility and the discretion to fashion relief to the circumstances of the matter." *Trooper Ink Co. v. Warren,* 279 N.J.Super. 257, 263, 652 A.2d 749 (App.Div.1995); *See also Bankruptcy Estate of B.J. McAdams, Inc. v. Ralston Purina Co.,* 154 B.R. 809, 811 (N.D.Ga.1993)(citing *Browning v. Navarro,* 743 F.2d 1069, 1083 (5th Cir.1984)).

■ Having found that Bryant and Debtor mutually entered into a binding contract, and that the contract was affirmed by Debtor upon reaching the age of majority, this Court finds that Bryant has failed to show cause for lifting the stay. Therefore, the Bankruptcy Court's denial of Bryant's motion for relief from automatic stay is affirmed.

## IV. CONCLUSION

For the above reasons, Bryant's appeal of the Bankruptcy Court's Orders finding that a valid and enforceable contract exists

is denied. An appropriate order will issue on even date herewith.